1          In the United States District Court
                District of South Carolina
2                  Columbia Division

3              Case No: 3:07-3782-JFA

4
                                    )
5   Carlos Edward Martin and        )
    Tashiana Anita Martin,          )
6                                   )
                                    )
7                  Plaintiff(s),    )
                                    )         Deposition
8                                   )
    vs.                             )
9                                   )             of
    Leon Lott, as                   )
10  representative for the          )DEPUTY BENJAMIN P. FIELDS
    Richland County Sheriff's       )
11  Department, Deputies Ben        )
    Fields and Joseph Clarke,       )
12  in their individual             )   **ORIGINAL**
    capacities as deputies          )
13  with the Richland County        )
    Sheriff's Department,           )
14                                  )
                   Defendant(s),    )
15                                  )

16
          Deposition of DEPUTY BENJAMIN P. FIELDS, taken
17  before Jennifer L. Thompson, CVR, Nationally Certified
    Verbatim Court Reporter and Notary Public in and for the
18  State of South Carolina, scheduled for 9:30 a.m. and
    commencing at the hour of 10:02 a.m., Thursday, November
19  12, 2009, at the office of Davidson & Lindemann, P.A.,
    Columbia, South Carolina.
20

21                    Reported by:
                 Jennifer L. Thompson, CVR
22

23

24

25

```
1                        APPEARANCES

2
     For the Plaintiff Carlos Edward Martin:
3    Erika V. Harrison, Esquire
     Fountain Walk
4    360 Concord Street, Suite 304
     PO Box 20956
5    Charleston, SC 29413

6    Attorney for Plaintiff Tashiana Anita Martin
     J. Christopher Mills, Esquire
7    1527 Blanding Street
     Columbia, SC 29201
8

9
     For the Defendant(s):
10   Robert D. Garfield, Esquire
     Davidson & Lindemann, P.A.
11   1611 Devonshire Drive, 2nd Floor
     PO Box 8568
12   Columbia, SC 29202

13
     Also present:
14   Scott Hayes, Esquire, RCSD
     Charles Bonner, Esquire
15   Leigh Anne Wills, Paralegal
     Shelley Stafford, Paralegal

16

17                          INDEX
```

```
18   Stipulations . . . . . . . . . . . . . . . . . . 3
     Direct Examination by Mr. Mills . . . . . . . . . 3
19   Examination by Ms. Harrison . . . . . . . . . . . 63
     Re-Direct Examination by Mr. Mills . . . . . . . 166
20   Cross Examination by Mr. Garfield . . . . . . . . 169
     Further Examination by Mr. Mills . . . . . . . . 173
21   Errata . . . . . . . . . . . . . . . . . . . . . 178
     Certificate . . . . . . . . . . . . . . . . . . . 179
22

23                        EXHIBITS
```

```
     Exhibit No. 1:  Incident Report (3 pgs)
24   Exhibit No. 2:  Statement (2 pgs)
     Exhibit No. 3:  Photo (1 pg)
24
```

```
 1                        STIPULATIONS

 2              This deposition is being taken pursuant to the

 3              Federal Rules of Civil Procedure.

 4                          - - - -

 5              The reading and signing of this deposition is

 6              reserved by the deponent and counsel for the

 7              respective parties.

 8

 9     Whereupon,

10              DEPUTY BENJAMIN P. FIELDS, being duly sworn

11              and cautioned to speak the truth, the whole

12              truth, and nothing but the truth, testified

13              and deposed as follows:

14              Court Reporter:  State your full name for the

15              record, please.

16              Witness: Benjamin Paul Fields

17                          - - - - -

18                     DIRECT EXAMINATION

19     BY MR. MILLS:

20     Q    Deputy Fields, I'm Chris Mills.  I represent

21          Tashiana Martin, and I'm going to be asking you

22          some questions about an incident back on October

23          24, 2006.

24

25          MR. MILLS: Madame Court Report, can we go ahead
```

1              mark --

2

3    Q    Well, let me ask you first.  The incident report

4         there that's in front of you, do you see that?

5    A    **Yes, sir.**

6    Q    Is that your incident report from that event?

7    A    **Yes, sir, it is.**

8    Q    Is that your own handwriting?

9    A    **Yes, sir.**

10   Q    And when did you write that report?

11   A    **On 10/24/05, October 24, 2005.**

12   Q    All right.  So the same day of the incident?

13   A    **Yes, sir.**

14   Q    Would you have written it at the incident site or

15        back at the station?

16   A    **At the incident site, most likely.**

17   Q    All right.  Do you remember when at the incident

18        site you wrote that?

19   A    **It probably would have been right after the**

20        **incident took place.**

21   Q    Okay.

22   A    **Where they were transported.  I mean, I know it was**

23        **after -- right after the incident took place,**

24        **whether they were on scene or not.  We have -- it**

25        **was a lot of paperwork to fill out, so.**

1  Q   It would have been after EMS had come there,
2      correct?
3  **A  Yes, sir.**
4  Q   Okay.  And probably after they had been transported
5      away?
6  **A  That's correct.  Yeah.  Most likely.**
7  Q   All right.  And when you went to the Criminal
8      Justice Academy were you trained in writing
9      incident reports?  Did you cover that in your . . .
10 **A  Yeah, we covered it, but we were really trained in**
11     **writing incident reports when we got into our field**
12     **training officer once we graduated the Academy.**
13 Q   Okay.  Just kind of like the OJT and the riding
14     with and officer?
15 **A  Yes, sir.**
16 Q   And writing the report up afterwards and him
17     reviewing it?
18 **A  Yes, sir.**
19 Q   Or her.
20 **A  Yes, sir.**
21 Q   I understand you had been on the Department about a
22     year and a half by the time this incident happened,
23     is that about right?
24 **A  I think so, yeah.**
25 Q   And had you gone through the on-the-job training

1       about writing an incident report?

2  **A**   **Yes, sir.**

3  Q   All right.  And did you feel comfortable with

4       writing incident reports?

5  **A**   **Yes, sir.**

6  Q   All right.  And did you attempt to be accurate in

7       your incident report?

8  **A**   **I did.**

9  Q   As I read this one, it appears to flow in

10      chronological order.  Is that the way you usually

11      write about it, in sequences - This happens, this

12      happens next, in that kind of order?

13  **A**   **Yes, sir.**

14  Q   Were you able to do that in this case?

15  **A**   **For the most part, I believe so, yeah.**

16  Q   All right.  Was there any part that was not

17      sequentially in order?

18  **A**   **From reading over it, I believe it as all -- I**

19      **believe I put it in the best order I could have.**

20  Q   And you just had a chance to look over it just --

21  **A**   **Yes, sir.**

22  Q   -- a few minutes before we started this deposition.

23  **A**   **Yes, sir.**

24  Q   All right.  I'd like to turn your --

25

1          MR. MILLS: Can we mark that as Exhibit No. 1,

2               please?

3

4                    (Whereupon, October 24, 2005 Incident

5                    Report, consisting of 3 pages, was marked

6                    Exhibit No. 1 for identification.)

7

8    Q    I want to skip over your confrontation with Mr.

9         Martin and I want to focus on the incident report

10        and Mrs. Martin's arrival onto the scene.

11   **A    Okay.**

12   Q    You have described having to have a confrontation

13        with Martin in the first two pages, and on the

14        third page, let's see, seventh line.  And the

15        sentence before it says, "C. Martin loud and verbal

16        comments over and over again stop resisting, get

17        your hand behind your back."  Do you see that?

18   **A    Yes, sir.**

19   Q    And then your next sentence says, "At this time

20        about 15 to 20 people gathered."  Is that correct?

21   **A    Yeah.   That's what I wrote, sir.   Yes, sir.**

22   Q    And at that time, Tashiana Martin came out, is that

23        correct?

24   **A    Yes, sir.**

25   Q    All right.  So Tashiana Martin was not out there

Deputy Benjamin P. Fields - 11/12/2009
Carlos and Tashiana Martin v. Leon Lott, et al.

8

```
 1        originally causing a scene to draw this crowd out
 2        there, was she?
 3    A   Ask the question one more time, please.  I mean, I
 4        just want to clarify the question.
 5    Q   Well, as I understand it, Martin was yelling and at
 6        that time a crowd of 15 and 20 people gathered,
 7        correct?
 8    A   Correct.
 9
10        MR. GARFIELD: Carlos Martin was yelling?
11        MR. MILLS: Yes.
12
13    Q   "C. Martin loud verbal comments over and over again
14        stop resisting get your hand behind your back.  At
15        that time, about 15 and 20 people had gathered."
16        Is that correct?   That's what you said?
17    A   Yeah.   That's what I have in my report, yes, sir.
18    Q   And then -- It doesn't then.  "And Carlos Martin's
19        wife, T. Martin, came outside with her camera
20        phone."  Right?
21    A   Correct.
22    Q   And so she comes out after the crowd has gathered
23        with a camera phone, is that correct?
24
25        MR. GARFIELD: Object to the form.  Go ahead.
```

Deputy Benjamin P. Fields - 11/12/2009
Carlos and Tashiana Martin v. Leon Lott, et al.

9

1

2    A    People had gathered and then she came out, that's

3         correct.

4    Q    And my question was, they had gathered before she

5         had come out?

6    A    Some people had, yes.

7    Q    Okay.  Well, you said about 15 to 20 people had

8         gathered before she came out, is that right?

9    A    Yes, sir.

10   Q    Did more people come after that?

11   A    I don't know.  I don't have that in my report, I

12        don't believe.

13   Q    Okay.  And then going down here a bit, and I

14        understand you had some officers, Clarke and Smith,

15        come assist you --

16   A    Yes, sir.

17   Q    -- with Mr. Martin, is that correct?

18   A    Yes, sir.

19   Q    And if you go down the page, I think we see "Two

20        knee strikes to the right side of the body.

21        Finally . . ."  -- You see the finally part?

22   A    Yes, sir.

23   Q    "Finally Clarke and Smith got there and C. Martin

24        was handcuffed."  Is that correct?

25   A    Yes, sir.

Deputy Benjamin P. Fields - 11/12/2009
Carlos and Tashiana Martin v. Leon Lott, et al.

10

| 1 | Q | All right. And then you say, "At that time, |
| 2 | | Tashiana Martin came running outside cursing and |
| 3 | | yelling." Where did she come from? |
| 4 | A | **I don't know. I mean, I can assume, but I don't** |
| 5 | | **know.** |
| 6 | Q | Just your best -- I mean, you said she came |
| 7 | | outside. Was she coming from outside the house? |
| 8 | A | **She was coming from outside --** |
| 9 | Q | The apartment? |
| 10 | A | **-- from the apartment building.** |
| 11 | Q | Okay. So she wasn't right there at the time that |
| 12 | | Clarke and Smith first responded to the scene? |
| 13 | A | **Probably not, no.** |
| 14 | Q | Because she came outside, right? |
| 15 | A | **Correct.** |
| 16 | Q | Okay. Now, you've given a statement as well, is |
| 17 | | that correct? |
| 18 | A | **Yes, sir.** |
| 19 | Q | And when did you write that statement? |
| 20 | A | **I probably -- Well, let me see if there's a date on** |
| 21 | | **here.** |
| 22 | Q | I didn't see one, so that's why I'm asking. |
| 23 | A | **Well, they called me into Internal Affairs to write** |
| 24 | | **the statement. I'm not sure -- I'm not quite sure** |
| 25 | | **of the date of it.** |

```
 1    Q    Okay.  But you think this statement was done in

 2         response to request by Internal Affairs?

 3    A    Right.  It could have been a couple days after.  It

 4         could have been a week after.  That type of thing.

 5         That's typically how they handle that.

 6    Q    Okay.  So that was done -- you knew then a

 7         complaint had been filed against you over this

 8         incident, correct?

 9    A    Yes, sir.

10    Q    And I assume, then, you would have taken even more

11         care and time in writing out this statement to make

12         sure it was accurate?

13

14         MR. GARFIELD: Object to the form.  Go ahead.

15

16  : A    Sure.  I mean, I could have.  I think I try to take

17         my time writing both.

18    Q    Right.  Okay.

19    A    More time, I mean, I think I try to, you know, --

20    Q    Sure.  I understand.

21    A    -- be as consistent as possible.  Sometimes you

22         remember things.

23    Q    Sure.  And what I'd like to draw your attention to

24         in this instance, in about midway down, your

25         sentence you said, "I advised Mr. Martin who handed
```

Deputy Benjamin P. Fields - 11/12/2009
Carlos and Tashiana Martin v. Leon Lott, et al.

12

```
 1       me an ID."  Do you see that?
 2   A   Yes.  I see that.
 3   Q   And "at that time to calm down, but he, again,
 4       continued to curse and be irate about the situation
 5       saying the same things over and over again, 'you
 6       racist cop, mother fucker, this is bullshit.'"  Is
 7       that what was going on?
 8   A   Yes, sir.
 9   Q   And you advised him to calm down, but he didn't, is
10       that right?
11   A   Yes, sir.
12   Q   And here, again, you say at this time a crowd was
13       gathering because -- and Mr. Martin was still
14       making a scene, is that correct?
15   A   Yes, sir.
16   Q   All right.  And then down a little bit later on you
17       say, "I turned Mr. Martin around and he started
18       yelling for his wife.  I got one cuff on his right
19       hand and then Mr. Martin started to fight and fling
20       his left arm and kick."  Is that right?
21   A   Yes, sir.  I'm with you.
22   Q   All right.  So, again, his wife is arriving on the
23       scene after a crowd is gathered, is that correct?
24
25       MR. GARFIELD: Object to the form.  Go ahead.  Asked
```

Deputy Benjamin P. Fields - 11/12/2009
Carlos and Tashiana Martin v. Leon Lott, et al.

13

```
 1                  and answered.  Go ahead.

 2        MR. MILLS: No.  I'm asking him about this

 3             statement, Mr. Garfield.

 4        MR. GARFIELD: Versus what happened?

 5        MR. MILLS: No.  I'm asking if that's what he wrote

 6             in this statement.

 7        MR. GARFIELD: Oh, you're just asking if that's what

 8             he wrote in the statement?

 9        MR. MILLS: Uh-huh.  I don't think I had asked him

10             about it before, but maybe I'm wrong.

11        MR. GARFIELD: That's fine.  Go ahead and answer it.

12

13   A    If you could ask the question one more time.

14   Q    That Ms. Martin arrived after the crowd had

15        gathered.  Is that what you said in this statement?

16   A    I'm trying to look where I put the crowd gathered

17        in this statement.

18

19        MR. GARFIELD: Could you maybe show him, Chris,

20             where you're talking.

21        MR. MILLS: Sure.

22

23   A    I see the part where she came outside.

24   Q    "You racist assed cop.  I advised Mr. Martin to

25        calm down; he did not.  At this time, a crowd was
```

Deputy Benjamin P. Fields - 11/12/2009
Carlos and Tashiana Martin v. Leon Lott, et al.

14

1         gathering."

2    A    **Okay.  I got you.  Yes, sir.  I'm with you now.**

3    Q    And then later on you talk about Ms. Martin taking

4         pictures.

5    A    **Came outside.  Yes, sir.**

6    Q    Okay.  Now, on the next page at the top --

7    A    **Okay.  I mean, I did answer your question already?**

8    Q    Yes, you did.  I'm sorry.  I apologize.  I'm now

9         moving on to the -- Towards the bottom of the first

10        page you say, the last sentence on the bottom of

11        the first page, "then after about five or so

12        minutes another unit showed up, Deputy Clarke and

13        Smith."  And then moving up top of page.  And then

14        you say "that Martin still did not comply.  Clarke

15        pushed his head down, Smith grabbed his left arm,

16        got up behind his back."  And then you say "then

17        out of nowhere came Ms. Martin yelling and

18        cursing."  Is that right?

19   A    **Correct.**

20   Q    So that's, again, her arriving on the scene out of

21        nowhere because she was not there during that time,

22        is that correct?

23

24        MR. GARFIELD: Object to the form.  Go ahead.

25

Deputy Benjamin P. Fields - 11/12/2009
Carlos and Tashiana Martin v. Leon Lott, et al.

15

```
 1   A    She was there taking pictures with the camera

 2        phone.

 3   Q    Right.

 4   A    And then she went somewhere.

 5   Q    Left.

 6   A    And then she came -- This is her coming back.

 7   Q    And when she came back --

 8

 9        MR. GARFIELD: I'm sorry.  Were you through with

10             your answer?

11

12   A    Yes, sir.

13

14        MR. GARFIELD: Just be sure not to talk over each

15             other for the court reporter to take

16             everything down.  Thank you.

17

18   Q    You want to add anything else?

19   A    Just quickly, she arrived and left twice, according

20        to my report and the Internal Affairs statement.

21   Q    All right.

22   A    That's what I have written down.

23   Q    Okay.  Just want to make sure about that.  Now, I

24        understand during the time that the crowd was there

25        that no one threatened you.  Nobody in the crowd
```

```
 1          threatened you.

 2

 3          MR. GARFIELD: Object to the form.  Go ahead.

 4

 5    A     I mean, I don't remember, but I don't have it

 6          written down anywhere.

 7    Q     Okay.  Is it also true that no one in that crowd

 8          tried to interfere with you?

 9

10          MR. GARFIELD: Object to the form.  Go ahead.

11

12    A     No one physically interfered, that's correct, sir.

13    Q     Now, you remember testifying in the criminal trial,

14          right?

15    A     Somewhat, yeah.  I mean, I do remember --

16    Q     Oh, sure.  I mean, I'm not asking you to remember

17          verbatim what you said.

18    A     Okay.  Yes, sir.  I do remember.

19    Q     But I'm looking at a transcript here and the

20          question was asked of you at the time, well, did

21          anybody -- did you hear anybody threaten you.  And

22          your response at the time is, I did not hear

23          anybody threaten me, no.  So was that accurate and

24          truthful at the time you said it in the criminal

25          trial?
```

Deputy Benjamin P. Fields - 11/12/2009
Carlos and Tashiana Martin v. Leon Lott, et al.

17

```
 1   A   If I could see it, sir.

 2   Q   You could.  Sure.

 3   A   Okay.  Yes, sir.  That was -- Yes, sir.

 4   Q   That's what you said?

 5   A   Yes, sir.

 6   Q   And then the second question is, did anybody in

 7       this crowd, this mob, try to assault you or

 8       interfere with what you were doing.  And your

 9       response was what?

10   A   No, sir.

11   Q   Okay.  I understand you work out at a place called

12       Ironworks or what's it called?

13   A   South Carolina Barbell.

14   Q   South Carolina Barbell.  Where is that located?

15   A   On Two Notch.  You know where Sesqui Station is?

16   Q   Sure.

17   A   It's like a bunch -- there's a bunch of different

18       like doctors office and things like that --

19   Q   The little small areas off to the right?

20   A   Yeah.  There's a gym up in there.

21   Q   Okay.  And do you live out in that area?

22   A   No, sir.

23   Q   Where do you live?

24   A   I live down by the football stadium.  You want my

25       address?
```

1   Q   No, no.  That's all right.  I'm just curious why

2       you work out there, at the Barbell place.

3   **A**   **Why do I?**

4   Q   Yes, sir.

5   **A**   **Because I power lift.**

6   Q   Okay.  And how much can you lift?

7   **A**   **There's a lot of different lifts --**

8   Q   Okay.  I'm sorry.  Yeah, you're right.  Let's go

9       back.  How about just bench pressing.

10  **A**   **My best bench is 475.**

11  Q   Okay.  And you do, what, like 25 reps or what do

12      you --

13

14      MR. GARFIELD: Object to the form.  Go ahead.

15

16  **A**   **No.  Power lifting is a sport, like you try to lift**

17      **as much as you can one time.**

18  Q   Okay.

19  **A**   **Yes, sir.**

20  Q   Do you do some training for that?  I mean, I assume

21      you do some -- you have to build up the muscles to

22      be able to withstand that kind of a -- like a jerk

23      or something like that, right?

24  **A**   **Yes, sir.**

25  Q   And how long have you been power lifting as a form

Deputy Benjamin P. Fields - 11/12/2009
Carlos and Tashiana Martin v. Leon Lott, et al.

19

1      of exercise?

2  A   **I think maybe three or four years now.  I don't**

3      **know exactly, though.  But I think -- I don't**

4      **remember exactly when I started.**

5  Q   Okay.  Were you doing it at the time when this

6      incident happened on October 24, '05?

7  A   **I really don't remember.**

8  Q   Okay.  Were you working out somewhere before that?

9  A   **Yes, sir.**

10 Q   Okay.  You seem to be in pretty good physical

11     shape.  Is that something you've taken care of

12     throughout your life?

13 A   **Yes, sir.**

14 Q   Did you play sports in high school?

15 A   **Yes, sir.**

16 Q   What did you play?

17 A   **Basketball and football.**

18 Q   All right.  And where was that?  Where did you grow

19     up?

20 A   **I grew up in Pennsylvania.**

21 Q   Okay.  What part?

22 A   **Lancaster.**

23 Q   All right.  And what year did you graduate from

24     high school?

25 A   **2000.**

Deputy Benjamin P. Fields - 11/12/2009
Carlos and Tashiana Martin v. Leon Lott, et al.

20

```
 1   Q    And what was the name of the high school?
 2   A    Well, I went to Penn Manor High School for my first
 3        three years and then I went to a private Christian
 4        school my senior year.
 5   Q    Okay.  I understand you went off to school in
 6        Kansas.
 7   A    Yes, sir.  A junior college in Kansas.
 8   Q    Was that directly after high school?
 9   A    Yes, sir.
10   Q    All right.  So that would have been until like
11        2002?
12   A    Yes, sir.
13   Q    All right.  And did you get an associate's degree
14        from there?
15   A    Yes, sir.
16   Q    And after that you came to Columbia because your
17        parents had moved down here?
18   A    Yes, sir.
19   Q    And what kind of work did you do?  Did you go to
20        school?  Did you decide to work?
21   A    Oh, I went -- I took some courses at Midlands Tech,
22        but I worked for my dad for a year.
23   Q    Okay.  What did your dad do?
24   A    He's the executive director of the Oliver Gospel
25        Mission.
```

Deputy Benjamin P. Fields - 11/12/2009
Carlos and Tashiana Martin v. Leon Lott, et al.

21

 1   Q   Okay.  And you worked there at the Mission?

 2   A   **Yes, sir.**

 3   Q   Okay.  And when did you make a decision that you

 4       were going to go into law enforcement?

 5   A   **I guess it was about a year working for him.  I put**

 6       **my application in for Richland County.**

 7   Q   Okay.  Had you had any previous experience or

 8       interest in law enforcement?

 9   A   **No, sir, I did not.**

10   Q   What drew you to it?

11   A   **I took some courses at Midlands Tech and one of the**

12       **guys who taught the course was a Deputy Sheriff for**

13       **us.**

14   Q   Okay.

15   A   **And so he encouraged me to put my application in.**

16   Q   All right.

17   A   **And I did.**

18   Q   Do you remember who that Deputy Sheriff was?

19   A   **Yeah.  Flynn Tanner.**

20   Q   Okay.  Were you hired on the first application?

21   A   **Yes, sir.**

22   Q   And so your attendance at the Criminal Justice

23       Academy -- Well, what was your class at Midlands

24       Tech?

25   A   **Well, I took -- I think I took three altogether.  I**

1    took Criminal Justice 101.

2  Q  Okay.

3  A  I can't remember now.  Criminology, I think.  And

4     one other one.  I can't --

5  Q  Was it also in the Criminal Justice --

6

7     MR. GARFIELD: Hold on.  Hold on.  I'm sorry, Chris.

8         Were you through with your answer?

9

10 A  Yes, sir.

11

12    MR. GARFIELD: Okay.  Go ahead.

13

14 Q  No, please add anything you'd like.

15 A  No, no.  Yeah.  I mean, it was those three.  All

16    three criminal justice courses.

17 Q  Okay.  Thank you.  And so that kind of sparked

18    your interest in it, is that what I understand?

19 A  Yeah, I guess.  Yeah.

20 Q  Okay.  Was is it an economic thing as well?  I

21    mean, were you looking for a career or . . .

22 A  Not really.  I mean, I didn't know how long I was

23    going to do it for.

24 Q  All right.  Did you have any legal classes when you

25    were at Midlands Tech about the law in those

1        criminal justice classes that you took?

2    A   **Yeah, I had one.  I think it was a criminal law**

3        **class I want to say.**

4    Q   And what did it -- What was the general topic

5        matter of that?

6    A   **Just going over laws and things like that, as far**

7        **as I can remember.  And I don't remember it very**

8        **well.**

9    Q   Okay.  Do you remember what kind of grades you got

10       in it?

11   A   **I'd have to look.  I think a B.  I think.  I don't**

12       **know for sure, though.**

13   Q   All right.

14   A   **I'm speculating.**

15   Q   When you say the laws, are you talking about just

16       South Carolina criminal laws, criminal law in

17       general?

18   A   **Probably both, I would think.  But I don't know for**

19       **sure.  I mean, it was a real thick book.**

20   Q   Okay.  Was it an introductory course?

21   A   **It probably was.**

22   Q   So other than that the only other -- I guess you

23       went to the Criminal Justice Academy here, correct?

24   A   **Yes, sir.**

25   Q   The nine week course?

Deputy Benjamin P. Fields - 11/12/2009
Carlos and Tashiana Martin v. Leon Lott, et al.

24

1    A    Yes, sir.

2    Q    All right.  And the Richland County Sheriff's

3         office sent you to the Academy prior to you

4         attending -- going on the job with them?  Well, how

5         did that work?  Tell me how it worked.

6    A    Well, I was hired in the courthouse originally.

7    Q    Okay.

8    A    And I got an academy slot.

9    Q    Okay.

10   A    And then once I went to the academy then I was on

11        the road.

12   Q    When did you start your courthouse slot with the

13        Richland County Sheriff's Department?

14   A    January of 2010.  Oh, I'm sorry.  January 10, 2004,

15        I believe.

16   Q    Okay.  January 10, 2004.

17   A    Yeah.

18   Q    How long were you in the courthouse?

19   A    About a year.

20   Q    Okay.  So that would take us to January '05.

21   A    Yeah.  Well, a little past that probably before I

22        actually -- I mean, I got an academy date.

23   Q    When was your academy date?

24   A    Well, I had an -- I got promoted and had an academy

25        date like I think in November or December.  But I

Deputy Benjamin P. Fields - 11/12/2009
Carlos and Tashiana Martin v. Leon Lott, et al.

25

```
 1            had to wait to go to the academy until March.

 2    Q      Okay.  So you graduated from the academy in March -

 3            - No.  I go is would it be April or May.

 4    A      It would have been May.

 5    Q      May.  Okay.  So you actually graduated from the

 6            academy approximately about five months before this

 7            incident?

 8

 9            MR. GARFIELD: Object to the form.  Go ahead.

10

11    A      Yes, sir.

12    Q      How long was it between the time that you graduated

13            from the academy until this incident?

14    A      I'll do the math now.  About five months.

15    Q      Okay.  Did you have some trips with a master

16            sergeant?  Did you do training with a master

17            sergeant?

18    A      No --

19    Q      Not a master sergeant, but a training officer?

20    A      Yes, sir.

21    Q      A field training officer, excuse me, FTO.

22    A      Yes, sir.

23    Q      And how long did that go on?

24    A      It's twelve weeks, I believe, at the time.

25    Q      Okay.  So that's four months, is that right?  Or at
```

Deputy Benjamin P. Fields - 11/12/2009
Carlos and Tashiana Martin v. Leon Lott, et al.

26

1       least I'm using twelve weeks to equal four --

2       Excuse me, three months.

3   **A**   **Yeah, about three months.**

4   Q   Three months.  I apologize, my math's bad.

5   **A**   **That sounds about right.  Yeah.**

6   Q   All right.  So by time it got to -- If you started

7       May, did it for three months, we're talking about

8       June, July, August, is that correct?

9   **A**   **Yeah.  That's right.  I got cut loose in August.**

10  Q   All right.  And is that the point that you were

11      placed in your patrol car?

12  **A**   **Yes, sir.**

13  Q   Going back to the Criminal Justice Academy, did you

14      have any classes in what's called legals?

15  **A**   **Yes, sir.**

16  Q   All right.  And did you study issues about what it

17      takes, you know, reasonable suspicion, probable

18      cause to make an arrest?

19  **A**   **Yes, sir.**

20  Q   And did you also discuss about constitutional

21      rights of various individuals -- of citizens?

22  **A**   **Yes, sir.**

23  Q   And did you cover, let's say, First Amendment

24      rights of citizens in interacting with police?

25  **A**   **Yes, sir.**

Deputy Benjamin P. Fields - 11/12/2009
Carlos and Tashiana Martin v. Leon Lott, et al.

27

1  Q  All right. And what is your understanding of a

2     citizen's right to oppose a police officer's

3     actions verbally?

4

5     MR. GARFIELD: Object to the form question. Go

6        ahead, Ben.

7

8  A  **I mean, they're allowed to. They're allowed to**

9     **object to you and curse at you and things of that**

10    **nature as long as they're not fighting words and**

11    **things like that.**

12 Q  All right. And on this incident date, which was --

13    I guess, how many resisting arrest charges had you

14    made before this?

15 A  **I really don't know.**

16 Q  Had you made any?

17 A  **I could have, but I honestly I just don't know.**

18 Q  I mean, we're talking about three months of being

19    on your own?

20 A  **Between FTO and being on my own, I really -- I may**

21    **have; I may not have. Like I said, I can't -- I**

22    **don't know.**

23 Q  Okay. How about breach of peace? Had you made any

24    arrests for breach of peace prior to this incident?

25 A  **I could have.**

1    Q    Is it you don't know?  I mean, you could have as --

2    **A    Yeah.  I mean, I don't know.**

3    Q    Do you have any specific memory of that?

4    **A    Not off the top of my head, no, sir.**

5    Q    Okay.  Have you ever been in an instance where

6         you've arrested somebody and then you've tried to

7         figure what to charge them with after the fact?

8    **A    Just in general my whole career?**

9    Q    Uh-huh.

10   **A    Has that ever happened?  Yes, sir.**

11   Q    Okay.  Have you ever given -- other than the trial

12        of this case, have you ever given any other sworn

13        testimony about this incident?

14   **A    About this incident here?**

15   Q    Yes, sir.

16   **A    Besides my report, my IA statement, and I guess the**

17        **court, I don't believe so.  Oh, and my question and**

18        **answer with Internal Affairs.**

19   Q    Okay.

20   **A    So, I mean, I guess that would go back to Internal**

21        **Affairs.**

22   Q    Okay.  Do you compete in any power lifting

23        competitions?

24   **A    Yes, sir.  All the time.**

25   Q    Is that city wide, statewide, regional?

Deputy Benjamin P. Fields - 11/12/2009
Carlos and Tashiana Martin v. Leon Lott, et al.

29

1    A    Statewide.  It can be nationwide.  I mean, it just

2         depends.  But I've competed statewide.

3    Q    Okay.  Do you do it as well with -- in law

4         enforcement, don't they have their own competitions

5         on that sport as well?

6    A    Yeah, they do.  I don't -- I think I maybe competed

7         once with law enforcement.

8    Q    But you compete with the public?

9    A    Yes, sir.

10   Q    You're in the big pool?  The big pool.  All right.

11        I'd like to ask you about what you saw

12        Tashiana Martin do when she came back.  Let me ask

13        you this.  Prior to her -- The first time she was

14        out there, did she do anything that violated the

15        law?

16

17        MR. GARFIELD: Object to the form of the question.

18            Go ahead.

19

20   A    And if you don't mind, can I refer back to my

21        report?

22   Q    Yes, sir.

23   A    I have here in my report, after 15, 20 people had

24        gathered T. Martin came outside with her camera

25        phone began taking pictures of me on top on C.

Deputy Benjamin P. Fields - 11/12/2009
Carlos and Tashiana Martin v. Leon Lott, et al.

30

| 1 | | **Martin. T. Martin was also yelling and cursing at** |
| 2 | | **our -- and I don't have this anywhere in my report,** |
| 3 | | **but I don't know if I was going to arrest her or** |
| 4 | | **not at that point in time once we got the other** |
| 5 | | **situation under control.** |
| 6 | Q | When she was -- What was she saying, you know, |
| 7 | | yelling and cursing? Can you give me what she was |
| 8 | | actually saying to you? |
| 9 | **A** | **No, sir.** |
| 10 | Q | You have no idea? |
| 11 | **A** | **I just know she was using foul language and taking** |
| 12 | | **-- and, I guess, taking pictures with her camera** |
| 13 | | **phone.** |
| 14 | Q | Okay. Now, there's nothing wrong with her taking |
| 15 | | pictures, correct? |
| 16 | **A** | **No, sir.** |
| 17 | Q | All right. And would you say that her yelling was |
| 18 | | directed to what she perceived as your conduct |
| 19 | | towards her husband? |
| 20 | | |
| 21 | | MR. GARFIELD: Object to the form. Go ahead. Calls |
| 22 | | for speculation. |
| 23 | | |
| 24 | **A** | **Yes, sir.** |
| 25 | Q | I mean, she was objecting to the way you were |

1          treating her husband.

2

3          MR. GARFIELD: Object to the form.  Calls for

4               speculation.  Go ahead.

5          MR. MILLS: No, I'm saying what she said.

6          MR. GARFIELD: That's fine.

7          MR. MILLS: Not what she thought.

8

9     A    **Well, again, I don't remember her exact words.  But**

10         **I just know there was a lot of yelling and carrying**

11         **on.**

12    Q    And it was directed at you?

13

14         MR. GARFIELD: Same objection.  Go ahead.

15

16    Q    Was it directed at you?

17

18         MR. GARFIELD: Same objection.  Go ahead.

19

20    A    **I would think so, yes.**

21    Q    Okay.  Did you see her yelling at anybody else?

22    A    **I did not see her yell at anybody else, no, sir.**

23    Q    Okay.  Was the fact that she was yelling at you,

24         would that be a basis to arrest her?

25    A    **Just yelling at me objecting to me?**

1   Q    Yes.

2   **A**    **No, sir.**

3   Q    Objecting to the way you were --

4   **A**    **No, sir.  Not objecting to the way.  No, sir.**

5   Q    So yelling at you and what she saw you do to her

6         husband and taking the pictures, neither of those

7         would be grounds to arrest her, correct?

8   **A**    **Correct.**

9   Q    Okay.  Now, I understand things changed from your

10       perspective when she came back out the second time.

11  **A**    **Yes, sir.**

12  Q    Is that fair?

13  **A**    **I think so, yes, sir.**

14  Q    All right.  And I think in the second instance you

15       indicated she came out of nowhere or came outside

16       and that she essentially just kind of -- Well, tell

17       me what she did.

18  **A**    **According to our report, sir, she came running out**

19       **cursing and yelling and swinging at RO Clarke,**

20       **which was Deputy Clarke at the time.  And she was -**

21       **- Again, I don't have this in my report, but,**

22       **basically, she was just out of control.  We had to**

23       **restrain her in some way.**

24  Q    Would it be fair to say that she just kind of

25       attacked you?

Deputy Benjamin P. Fields - 11/12/2009
Carlos and Tashiana Martin v. Leon Lott, et al.

33

1    A    Not me.  She was going after Deputy Clarke,

2         according to my report.

3    Q    All right.  And did she make contact with him?

4    A    I don't believe so.  I don't think I have that in

5         my report.

6    Q    When you're saying swinging, what were you

7         describing?  What was she --

8    A    I mean, she was just flailing out of control,

9         upset.

10   Q    Okay.

11   A    Those types of actions.

12   Q    So she came from wherever she was outside and came

13        and approached y'all?

14   A    Yes, sir.

15   Q    When's the first -- How far away was she when she

16        first -- when you first noticed that she was

17        coming?

18   A    Not very far.

19   Q    And tell me what you saw.  As I understand it, she

20        comes running at you -- You're kind of describing

21        kind of, you know, correct me if I'm wrong, I don't

22        want to misstate, flailing, just kind of almost

23        wildly coming at you is the image I'm getting based

24        on your description, is that --

25   A    She actually was coming at Deputy Clarke.

Deputy Benjamin P. Fields - 11/12/2009
Carlos and Tashiana Martin v. Leon Lott, et al.

34

1  Q   Deputy Clarke.

2  **A   Yes, sir.**

3  Q   Okay.  Where was Deputy Clarke at the time she was

4      coming after him?

5  **A   He was -- I'm trying to remember back that far.**

6  Q   Sure.  Take your time.

7  **A   Again, we had just -- Deputy Smith had control of**

8      **Mr. Martin.**

9  Q   Okay.

10 **A   So he was -- And then Deputy Clarke was trying to**

11     **move the crowd back, as I remember it.**

12 Q   Okay.  So at the time that Ms. Martin came out

13     there, Deputy Smith had already gotten -- Was Mr.

14     Martin up in handcuffs moving towards -- away or --

15 **A   I really don't know.  I really don't know.**

16 Q   Had you left from your contact with Mr. Martin at

17     that point?

18 **A   Yes, sir.**

19 Q   Okay.  So you were no longer on Mr. Martin, is that

20     right?

21 **A   That's correct, sir.**

22 Q   And Deputy Clarke was no longer on Mr. Martin?

23 **A   That's correct.**

24 Q   All right.  But she came out and she just came

25     after y'all as he -- as you're telling me he is

Deputy Benjamin P. Fields - 11/12/2009
Carlos and Tashiana Martin v. Leon Lott, et al.

35

1        pushing back the crowd, is that correct?  Or

2        telling the crowd to get back?

3    A   **Yeah.  Deputy Clarke was trying to move the crowd**

4        **back, and I was assisting him with that.**

5    Q   And that's when she --

6    A   **And that's when she came from, like I said,**

7        **wherever she came from, most likely the house, and**

8        **began to just flail in an out of control way**

9        **engaging Deputy Clarke.**

10   Q   So at the time that that was happening, you were

11       actually facing the building or where these people

12       were?  Correct me if I'm wrong.

13   A   **I would think -- Yeah.  As we're moving the crowd**

14       **back, yeah.**

15   Q   I mean, the crowd -- Was the crowd in the parking

16       lot or --

17   A   **Yeah.  They were kind of all around, but mainly the**

18       **parking lot.**

19   Q   Okay.  And so you were facing that area?  And when

20       I say that area, I'm talking about the building and

21       where the other people were, is that correct?

22       You're facing the crowd when you're trying to move

23       them back?

24   A   **Yeah.**

25   Q   Okay.

Deputy Benjamin P. Fields - 11/12/2009
Carlos and Tashiana Martin v. Leon Lott, et al.

36

| | | |
|---|---|---|
| 1 | A | **Yes, sir.** |
| 2 | Q | Sorry. Silly question. I'm sorry. |
| 3 | A | **That's okay.** |
| 4 | Q | And I think you said that she went after Clarke. |
| 5 | | And I'm talking about Ms. Martin. |
| 6 | A | **Yes, sir.** |
| 7 | Q | And how was that handled when she came after him? |
| 8 | | Give me the sequence of what happened, who did |
| 9 | | what, if you could. |
| 10 | A | **Okay. If I can refer to my report.** |
| 11 | Q | Feel free. |
| 12 | A | **She came around yelling and swinging at Deputy** |
| 13 | | **Clarke. At that point in time, I told her she was** |
| 14 | | **under arrest for breach of peace because of how** |
| 15 | | **loud she was and the language she was using.** |
| 16 | Q | Based on her exit coming there at him at that |
| 17 | | point, is that what you're saying? |
| 18 | A | **Yes, sir.** |
| 19 | Q | Based on her conduct from that point forward that |
| 20 | | she was yelling at the officer and cursing, is that |
| 21 | | right? |
| 22 | A | **Yes, sir.** |
| 23 | Q | Okay. And that was, in your mind, breach of peace? |
| 24 | A | **Yes, sir.** |
| 25 | Q | All right. Now, I thought you told me that you |

```
1         could yell at the officers if you wanted to and you

2         could disagree with them.

3    A    Object to them, yes, sir.  You can.

4    Q    So the yelling would not be part of the basis for

5         the breach of peace, would it, if it was directed

6         at the officers?

7    A    If they're fighting words and things of that nature

8         it could be and, again, depending on how loud she

9         was and things like that at the time.  I mean, we

10        take all that in consideration.  It wasn't just

11        based off, you know, I'm upset because of the way

12        you treated my husband, you know, stuff like that.

13        It was, at that point in time, -- Again, I don't

14        want to speculate.  All I can do is refer to my

15        report.  It happened a long time ago.

16   Q    I understand.

17   A    You know, she had objected earlier, obviously, when

18        she was taking pictures with the cell phone to me

19        the way that she felt like I was treating her

20        husband at the time.  And when she came back down

21        the hill, I don't believe at that point in time,

22        although I think I do have in my Internal Affairs

23        statement some of the stuff she was saying when she

24        was coming out of the house.

25   Q    Well, let's take a look at that, if we can.
```

1

2          MR. MILLS: And I'm sorry.  I don't think we've

3               marked your statement yet as an exhibit, so

4               let's go ahead and put that in there.  And,

5               Robby, I failed to neglect about the Internal

6               Affairs.

7

8                    (Whereupon, IA Statement, consisting of 2

9                    pages, was marked Exhibit No. 2 for

10                   identification.)

11

12   Q    We're talking about now the Q&A?  Because I think

13        this statement goes with the Internal Affairs.

14   **A    Yes, sir, it does.**

15   Q    And then you're welcome to look at that.  And then

16        I think there was a Q&A that went with ultimately

17        as well.

18

19        MR. GARFIELD: Hold on.  So we're talking --

20        MR. MILLS: Well, right now --

21

22   Q    Let me just stop you for a second.  You said about

23        her running down the hill.

24   **A    Yes, sir.  I believe I have in my Internal Affairs**

25        **statement what she was saying or some of the things**

```
 1           she might have been saying while she was running
 2           down.
 3    Q      Okay.  Well, go ahead.
 4    A      Let me just find it quickly.
 5    Q      Sure.  And on top of page two, if that's any help.
 6    A      Okay.  Yeah, the top of page two.  She came yelling
 7           and cursing, you know, what the F are y'all doing
 8           to him.  F you mother f'ers and she was swinging at
 9           me and Deputy Clarke.  That's what I have in my
10           Internal Affairs statement.
11    Q      Okay.  So you -- I'm sorry.
12    A      So, at that point in time, I felt like it was a
13           little more than objecting than to just what we
14           were doing.  But, in fact, she was just very loud,
15           very boisterous and very disorderly at that point
16           in time, I felt like.  And she was a threat to us
17           at that point in time.  It went a little bit beyond
18           objecting at that point in time to what we were
19           doing.
20    Q      So the verbal component of the breach of peace was
21           her saying what the fuck are y'all doing to him,
22           fuck you mother fuckers, right?
23    A      Basically --
24    Q      And the volume of it?
25    A      The volume of it, the scene that it might have
```

Deputy Benjamin P. Fields - 11/12/2009
Carlos and Tashiana Martin v. Leon Lott, et al.

40

```
 1          caused.  And, again, it was objecting to me as if I

 2          write you a ticket for speeding and you might say

 3          this is BS or whatever you might say.  Say you

 4          curse, okay.  All right.  Well, that's something I

 5          just got to deal with.

 6    Q     Okay.

 7    A     You're not a threat to me, though.

 8    Q     Okay.

 9    A     In that sense.  And I felt like at that point in

10          time because of how loud she was, because of her

11          actions on top of her yelling and carrying on, I

12          felt like it was breach of peace.

13    Q     Now, you said the scene it was creating.  Was an

14          additional scene created by when she came out and

15          said those words?

16    A     Yes, sir.

17    Q     All right.  How was this scene increased or changed

18          as a result of that?

19    A     Well, any time you have a big crowd like that, I

20          mean, it can -- we don't know -- Again, we don't

21          know the people in the crowd.  We don't know if

22          they could become hostile or anything like that.

23          We don't know who knows who or anything of that

24          nature.  And we had him handcuffed and subdued the

25          situation.  We were trying to deter the situation
```

1          at that point in time, move the crowd back, let's

2          see what we got.  And when she came running down

3          the hill it's like she kind of jumped that whole

4          scene back up again, in my mind.

5     Q    Prior to that time, had the crowd been threatening

6          -- I mean, we talked about the threatening and the

7          interfering.  But had they been cursing at you,

8          yelling at you, the crowd had been -- Had the crowd

9          been doing that prior to that time?

10    A    No, sir, not to my knowledge.

11    Q    Okay.  So, essentially, it was her coming out and

12         ramping it up with this language that kind of

13         stoked the fire, so to speak?

14    A    That's the way I interpreted it, yes, sir.

15    Q    Now, coming at the officers and swinging at y'all,

16         that's not breach of peace, is it?

17    A    No.  I mean, if she would have hit us, obviously it

18         would be an assault situation.  But her -- Like I

19         said, the volume of her voice and the language she

20         was using, the scene that she caused when she did

21         that would be the breach of peace.

22    Q    Okay.  And then, obviously, her attacking you, you

23         would have to defend yourself?

24    A    Yes, sir.

25    Q    All right.  How did you go about doing that?

1   A   If I could refer.

2   Q   Sure.

3   A   According to my statement, I don't have exactly,

4       but as I remember it, I basically put her up --

5       picked her up and put her on the ground.

6   Q   Okay.

7   A   I don't believe she was that big.  I don't know.  I

8       guess I could look in my report and see her size

9       and all that stuff.  But, yeah, I believe I picked

10      her up and just put her on the ground.

11  Q   Okay.  Did you have any assistance from Deputy

12      Clarke?

13  A   According to my -- Let me see here.  I'm referring

14      to my IA, my Internal Affairs statement, it looks

15      like Deputy Clarke tried to get the cell phone out

16      of her hand -- out of her hand out of it.  I don't

17      believe that makes sense.  Deputy Clarke was --

18  Q   Let me ask you this, if I could.  The next part of

19      that you said I had not even taken notice of the

20      cell phone.

21  A   Where are you at here, I'm sorry?

22  Q   Oh, the same where you just were.  It talked about

23      I could restrain her Deputy Clarke -- Several times

24      before I could restrain her, Deputy Clarke also

25      tried to get the cell phone in her hand out of it

1    that I was not even taking notice of.  I had not

2    even taken notice of.

3  **A**   **That's correct.**

4  Q   So you didn't even know she had the cell phone in

5    her hand.

6  **A**   **No, sir.  I was trying to get her hands behind her**

7    **back at that point in time.**

8  Q   Did y'all go up against a car prior to going to the

9    ground?

10  **A**   **Not that I remember.**

11  Q   Okay.  Could that have happened?

12  **A**   **It could have.**

13  Q   Did Deputy Clarke, to your memory, ever at all

14    assist you in taking her to the ground?

15  **A**   **Not that I remember.**

16  Q   Can you describe to me the manner in which she was

17    taken to the ground?  And I don't want you to do a

18    physical job.  I mean, if you can just give me some

19    descriptive phrases of any techniques you employed

20    and how she actually got to the ground.

21  **A**   **There was also probably a use of force report done,**

22    **I would think, in this whole situation.  And I**

23    **don't have a copy of that.**

24  Q   I think we do have a copy of that, and I can get

25    that to you if that will help you.

Deputy Benjamin P. Fields - 11/12/2009
Carlos and Tashiana Martin v. Leon Lott, et al.

44

1   A   **That would help me, yes.**

2   Q   Okay.  Sure.  This may be my only copy.  Well, let

3       me ask you this.  We've got this as a unit, and I

4       don't know if it comes as a unit or if we

5       mistakenly tagged on the incident report.

6   A   **It all kind of goes -- When we turn those in, it**

7       **all kind of goes together.**

8   Q   You put the incident report with it as well?

9   A   **Yes, sir, we do.**

10  Q   Okay.  I only have two pages attached to this one,

11      and I think your incident report there is three

12      pages.

13  A   **That is correct.  Yeah.**

14  Q   So would you have attached the whole one?

15  A   **I should have, yes, when I did it.  That would be**

16      **the correct way to do it.**

17  Q   And I don't know if this is going to be a lot of

18      help.  I just kind of looked through it again

19      because I think it just deals with Carlos Martin

20      and not necessarily Tashiana Martin.  But maybe,

21      you know, please.

22

23      MR. GARFIELD: Chris, if you're going to ask him

24          questions about that document, I'd like to

25          have an opportunity to --

1      MR. MILLS: Well, he asked for it, and so I gave it

2           to him.

3      MR. GARFIELD: I understand that. But you're

4           showing the document to him. Are you going to

5           ask questions directly relating to that

6           document, I guess is my question.

7      MR. MILLS: No, I'm not.

8      MR. GARFIELD: Okay.

9

10  **A**  **Yes, sir, that is just referring to Carlos Martin.**

11  Q  And, I'm sorry, I think that's the only one I have

12     so -- So should there have been a report written on

13     the use of force against Tashiana Martin?

14  **A**  **I would think so, yes.**

15  Q  Okay. Do you have any independent recollection of

16     submitting one?

17  **A**  **I can't remember.**

18  Q  Okay. I think when I kind of detoured you, I was

19     asking about the manner in which you took her down.

20     I know there's things like leg sweeps and straight

21     arm take down and those kind of things. So I'm

22     trying to get an understanding how she ultimately

23     got to the ground.

24  **A**  **From my report, and again I can speculate, I really**

25     **don't remember clearly. It sounds like I used**

1          something called muscling techniques in the sense

2          it makes you just muscle a person.  You're bigger,

3          you're stronger and you just kind of overtake them

4          and just put them on -- I mean, just --

5    Q     Is it almost like a bear hug kind of situation?

6          Just wrap them up and is that what --

7    A     That could --

8

9          MR. GARFIELD: Are you through with the question,

10               because I was going to make an objection?

11         MR. MILLS: No, go ahead and finish your --

12         MR. GARFIELD: Well, you said is that what and I

13               just -- Is that your question?

14         MR. MILLS: I'm going to let him finish --

15         MR. GARFIELD: Object to the form the question.  Go

16               ahead and answer.

17

18   A     Muscling techniques can be a lot of different

19         things.  You know, according to my reports, when I

20         tried to restrain her she was -- obviously, I was

21         facing her because she was hitting me on my body

22         and things of that nature.  So it could be

23         something like that, I guess, but I really don't

24         remember.  I just know I probably just used some

25         muscling techniques to take her to the ground.

 1   Q   You don't want the -- whoever you're trying to

 2       subdue to be facing you, do you?

 3   **A**   **No, sir.**

 4   Q   Okay.  So one of the first things you might try to

 5       do is get that person turned around, if you could?

 6

 7       MR. GARFIELD: Object to the form.  Go ahead.

 8

 9   **A**   **I would want that, yes, when I'm arresting**

10       **somebody.**

11   Q   And I understand you're not necessarily in control

12       of what you're doing, but if you have that option,

13       that you're going to attempt to do that, is that

14       correct?

15   **A**   **That is the best option for you, yes.**

16   Q   Because, obviously, if you're grabbing them facing

17       you it's kind of hard to take them down.

18   **A**   **Well, no, you can -- Yeah, they have a lot more**

19       **access to you.  That's right.**

20   Q   In this instance, do you know if you took her down

21       on her side, face first, on her back?

22   **A**   **As I remember it, I believe I put her down on her**

23       **face -- on her --**

24   Q   On her chest?

25   **A**   **On her chest, yes.**

1    Q    And what degree of force was used in that?

2    **A    As little as possible.  And --**

3    Q    All right.

4    **A    Go ahead.**

5    Q    And I understand that's a relative term, little as

6         possible.  I'm trying to ask you to quantify that.

7         Describe to me what as little as possible force

8         means when you take her down.

9    **A    Well, we're putting somebody on a cement ground**

10        **who's basically half my size.**

11   Q    Okay.

12   **A    And so I'm going to do that as quickly as I**

13        **possibly can.**

14   Q    All right.

15   **A    With, first, to make sure I'm not getting hurt.**

16   Q    All right.

17   **A    And, if at all possible, the subject not getting**

18        **hurt either.**

19   Q    Right.

20   **A    I don't believe she had any cuts or bruises on her,**

21        **and, again, I'm -- you know, I'm getting that from**

22        **-- I remember getting that from internal affairs**

23        **when it came up.  So I think I did a pretty good**

24        **job as far as I how I put her on the ground and**

25        **doing it quickly as I possibly could.  So that when**

Deputy Benjamin P. Fields - 11/12/2009
Carlos and Tashiana Martin v. Leon Lott, et al.

49

```
 1        I say as little as possible, I mean in the sense
 2        that --
 3    Q   I mean --
 4
 5        MR. GARFIELD: Were you through with your answer?
 6
 7    A   I am.  I don't think I'm clear on what --
 8    Q   That's okay.  It's my job to ask the questions, so,
 9        you know, if we have to struggle through it, we
10        will just kind of struggle through.
11            Were your hands under her when you put her
12        down there or would you be able to place her down
13        with your hands up?  Hands on her, rather.
14    A   I don't remember.
15    Q   Let me ask, Did you injure yourself taking Tashiana
16        Martin to the ground?
17    A   I could tell you this.  I had superficial cuts on
18        my hands and things like that.  As far as being
19        injured out or anything like that, no.  But I did
20        have some superficial cuts from the pavement.  From
21        her, I don't know.  It could have been from both
22        situations.
23    Q   Okay.  So you can't say that you got the cuts from
24        her because you just had a protracted -- a much
25        longer protracted incident with Mr. Martin,
```

Deputy Benjamin P. Fields - 11/12/2009
Carlos and Tashiana Martin v. Leon Lott, et al.

50

1      correct?

2   A   **Yes, sir, that'd be correct.**

3   Q   And that was struggling actually on the pavement,

4      correct?

5   A   **Correct.**

6   Q   And you were trying to get his hand out from under

7      him, correct?

8   A   **Yes, sir.**

9   Q   So you would have much more likely have come in

10      contact with the pavement in that situation than in

11      Ms. Martin's situation?

12

13      MR. GARFIELD: Object to the form.  Go ahead.

14

15   A   **I mean, it's possible in both.  I mean, it's**

16      **possible both ways.**

17   Q   Can you testify that you -- under oath, that you

18      received an injury from your contact with Tashiana

19      Martin?

20   A   **Oh, no, I'm sorry.  I would not testify to that,**

21      **no.**

22   Q   Okay.  In your description, is Deputy Clarke

23      helping you get her on the ground?

24   A   **If you don't mind, quickly I'm going to refer back**

25      **to this.**

Deputy Benjamin P. Fields - 11/12/2009
Carlos and Tashiana Martin v. Leon Lott, et al.

51

```
 1   Q   Feel free.

 2   A   In my report --

 3   Q   You're talking about now your incident report?

 4   A   Yes, sir.  I'm going to refer to my incident report

 5       here.  No, I believe I did that by myself.

 6   Q   Okay.  Do you recall Deputy Clarke -- you talked

 7       about before getting the crowd back.

 8   A   Yes, sir.

 9   Q   Do you recall him pushing an individual,

10       specifically a lady with a dog?

11   A   I do not remember it personally.  I guess it came

12       up.

13   Q   Okay.

14   A   I think that question was asked to me in my

15       Internal Affairs question and answer.

16   Q   Okay.

17   A   But I don't remember it, no, sir.

18

19       MR. MILLS: Robby, have you had a chance to go over

20            this with him?  Do you need to go over the

21            Q&A?

22       MR. GARFIELD: I would like to.  Thank you.

23       MR. MILLS: Okay.  Go.  Sure.

24

25                      (Short Break)
```

1

2    Q    Deputy Fields, when we took a break awhile back you

3         had an opportunity to look over, for lack of better

4         term, I'll call it Q&A, question and answer, a two

5         page document from the Richland County Sheriff's

6         Department Internal Affairs.

7              Have you had an opportunity to review that?

8    A    **Yes, sir.**

9    Q    All right. And I think -- I can't even remember

10        where we stopped. I'm sorry. It's been a while.

11

12        COURT REPORTER: The last question was: Do you

13             recall him pushing an individual, specifically

14             a lady with a dog?

15

16   Q    Okay. And I guess what brought that up was this,

17        is on the second page, the last couple of

18        questions.

19   A    **Yes, sir.**

20   Q    It was dealing with a black female holding a small

21        dog. You see that, the fourth question from the

22        bottom?

23   A    **Yes, sir.**

24   Q    All right. And asked -- I think the question was,

25        Did anyone else to threaten to put a black female

Deputy Benjamin P. Fields - 11/12/2009
Carlos and Tashiana Martin v. Leon Lott, et al.

53

1     in jail in that immediate area. And you responded,

2     yes, I didn't; Deputy Clarke did.

3         And then the next question was, Did he push

4     her, and your answer was no. And then question was

5     are you sure. I know for a fact he did not.

6   A   **Yes, sir.**

7   Q   All right. Does that refresh your recollection

8     about whether he pushed an individual or not?

9   A   **As far as did he push her is what you're asking me?**

10  Q   Yeah. Right.

11  A   **I mean, I did not see him. I did not see him push**

12     **her.**

13  Q   Okay.

14  A   **In that sense, no.**

15  Q   Well, you said and for a fact you know he didn't

16     push her.

17  A   **Yes, sir.**

18  Q   And you were truthful at the time you gave that

19     statement, correct?

20

21     MR. GARFIELD: Object to the form. Go ahead.

22

23  Q   Were you truthful at the time you gave that

24     statement?

25  A   **I was truthful at the time I gave that statement.**

Deputy Benjamin P. Fields - 11/12/2009
Carlos and Tashiana Martin v. Leon Lott, et al.

54

 1  Q   Thank you.  All right.

 2          Could you tell me a little bit about what

 3      happened after you -- Well, I think when we left

 4      it, you had gotten Ms. Martin on the ground.

 5  A   Yes, sir.

 6  Q   We had talked about that.  And tell me what

 7      happened after taking her to the ground.

 8  A   I handcuffed her up.

 9  Q   Okay.  All right.  And then what happened after

10      that?  Did you have any problem handcuffing her

11      once she was on the ground?

12  A   If I could refer back to my report.

13  Q   Sure.

14  A   According to my report, I did not once I got her on

15      the ground.  It was not an issue.

16  Q   Did you search her?

17  A   I think we had a female.  And, again, I don't have

18      this in the report, but I believe a female officer

19      would come and search her.  We did have a female

20      officer there with us.  So that's usually . . .

21  Q   And who was that officer?  I saw a list one time.

22      There was an Officer Goins there.  Sandra Goins.

23      [sic]

24  A   Yes.  That would be here.

25  Q   And I understand she arrived she arrived at some

1      point.

2  **A**  **Yes, sir.**

3  Q   So is it your belief or -- Let me see.  Did you

4      ever personally search Tashiana Martin?

5  **A**  **I don't believe I did.  Per policy we are allowed**

6      **to search females a certain way, but I don't recall**

7      **doing that.  I believe -- And, again, I believe**

8      **Officer Goins did.**

9  Q   And that would be -- When you say a search, and

10     I'll just say for lack of better terms, search

11     incident arrest, we're talking about kind of either

12     like a Terry pat down outside type of thing,

13     correct?

14  **A**  **Yeah.**

15  Q   Just for -- Mainly looking for weapons --

16  **A**  **Well, when we actually arrest an individual, if I**

17     **was, like a male, for example, I mean, we go in**

18     **pockets, I mean, we get pretty personal, you know,**

19     **to make sure they don't have things on them.**

20  Q   Okay.

21  **A**  **And so with females, that's why we like for a**

22     **female to search the females because they get more**

23     **personal with them and things like that.  It's just**

24     **a much safer way to operate.**

25  Q   But if a female's unavailable, you are authorized

```
1        to do that --
2    A   Yes.
3    Q   -- because it ultimately is someone under arrest
4        who you need to search to make sure there's no
5        contraband or weapons that can harm you or
6        themselves, is that fair?
7
8        MR. GARFIELD: Object to the form of the question.
9            Go ahead.
10
11   A   Yes, sir.
12   Q   Okay.  What happened after you put the handcuffs on
13       Ms. Martin?  What did you do with her?
14   A   I believe she was placed in a patrol car.
15   Q   All right.  Did you have any conversation with her
16       during that time?
17   A   I don't believe.  I don't believe so.
18   Q   Was she saying anything to you during that time?
19   A   I don't remember.
20   Q   Was she screaming and cussing and yelling?  Was she
21       still carrying on?
22   A   She could have been.  She was not in my patrol car,
23       so I don't really remember.
24   Q   I'm talking on the way to placing her in the patrol
25       car.
```

Deputy Benjamin P. Fields - 11/12/2009
Carlos and Tashiana Martin v. Leon Lott, et al.

57

1    A    I really don't remember.

2    Q    Okay.  There's been a discussion about the camera,

3         the cell phone camera.  What's your memory of what

4         happened to that after she was placed under arrest?

5         I think when we looked in the report, there was a

6         question about Deputy Clarke trying to get hold of

7         the cell phone.  Did you become aware of anything

8         that happened to the cell phone after you got Ms.

9         Martin under arrest?

10

11        MR. GARFIELD: Object to the form.  Go ahead.

12

13   A    I believe my supervisors on the scene at the time

14        handled all that.  I may have stuck the phone into

15        evidence.  And that's because of the pictures on

16        there.  But as far as -- Again, of course, we

17        talked about, immediately after, what happened as

18        far as we discussed what happened out there and

19        things like that.  So I knew about the cell phone.

20   Q    Okay.

21   A    As far as what was discussed between like her and

22        some other deputies.  But as far as me discussing

23        dealing with the cell phone personally between her

24        and Mr. Martin and all that, I didn't have anything

25        to do with that.

Deputy Benjamin P. Fields - 11/12/2009
Carlos and Tashiana Martin v. Leon Lott, et al.

58

1   Q   Okay.  So let me understand then.  Did you ever --
2       After that event, did you ever handle the cell
3       phone yourself?
4   A   **I could have, but I really don't remember.  There's**
5       **different chains of custody we would go through to**
6       **turn in evidence.  We can take it ourselves or we**
7       **go through a chain of command.**
8   Q   Right.
9   A   **And that's always changing sometime, you know, per**
10      **policy.  So at the time, it's very possible that I**
11      **could have stuck that into evidence.**
12  Q   I noticed on the last page of your incident report
13      it says cell phone was taken for evidence and put
14      in a RCSD drop box.  Would that indicate that you
15      had taken it into evidence?  I mean, would you put
16      that in there if you --
17  A   **That would indicate that I probably did.  But it,**
18      **unfortunately, doesn't say for sure whether I did**
19      **or not.**
20  Q   But you noted it in your incident report and you're
21      documenting your actions at this point, correct?
22
23      MR. GARFIELD: Object to the form.  Go ahead.
24
25  A   **I would think so, yes, sir.**

```
 1    Q    Okay.  So just following -- So, you don't recall

 2         ever picking up the cell phone or looking at the

 3         pictures?

 4    A    No, I know I ever looked at the pictures.  The

 5         first time I actually saw the pictures was actually

 6         a couple days ago.

 7    Q    Okay.

 8    A    I mean, that's the first time I've seen the

 9         pictures in four years or whatever.

10    Q    So you never looked at the pictures at the scene?

11    A    No, sir.

12    Q    And you never handled the phone or did anything

13         along that line?

14    A    No, sir.

15    Q    Okay.  Okay.  And so the extent that you go it, you

16         took it -- who -- you don't remember who handed it

17         to you?

18    A    I don't remember.  And, again, I'm not even for

19         sure that I'm the one who put it into evidence.

20         I'm really not.  I know it says it was in evidence

21         in my report, but I'm not 100 percent sure that I

22         stuck it in.  But it's possible.

23    Q    Right.  And I've never seen the evidence bag, so

24         I'm kind of at a loss here myself.  Shouldn't -- If

25         it is placed into evidence, isn't there a bag that
```

Deputy Benjamin P. Fields - 11/12/2009
Carlos and Tashiana Martin v. Leon Lott, et al.

60

```
 1       it's placed in, do y'all have those in your patrol

 2       car?

 3   A   Yeah.  What we do -- Yes, sir. We have bags that

 4       seal up and then once we put it in evidence,

 5       whether if it's a situation where we have to put it

 6       in a drop box or hand it to somebody.

 7   Q   When you say seal up, we're not talking about a

 8       ziplock bag; we're talking about something you

 9       would have to break a seal to get back into, is

10       that right?

11   A   Yes, sir, you would.

12   Q   I mean, once it's put in there, you have to tear it

13       open to get it open?

14   A   That's correct.  You have to cut it or tear it

15       open.

16   Q   What is the protocol once you put it in evidence?

17       How does one actually do that?  Do you . . .

18   A   Yeah.  What we would do is we would, whatever we're

19       putting into evidence, we'll take the cell phone,

20       for example, we put it into the bag, write all the

21       information about the case and things like that.

22       There's different things we have to fill out.  Then

23       we drop it in the drop box or we would give it to

24       the evidence person, if they're there.

25   Q   In other words, if the evidence -- I'm sorry.  I
```

Deputy Benjamin P. Fields - 11/12/2009
Carlos and Tashiana Martin v. Leon Lott, et al.

61

1      didn't mean to interrupt.

2  A    **Okay.**

3  Q    If you drop it to the evidence, you're talking

4      about going to the custodian and saying here it is

5      and you fill out a form and that kind of stuff,

6      right?

7  A    **Yeah.  Well, we deal with the evidence.  I mean,**

8      **we're the ones who put it in, make sure it's**

9      **sealed, all that kind of stuff.**

10  Q    Do you do a paper document along with that, by any

11      chance?

12  A    **On the evidence bag itself, there is a document on**

13      **there.**

14  Q    Okay.

15  A    **And then once we give it -- Once the evidence**

16      **person gets it, there's things they do with it.**

17  Q    So do you mark like the time and date that you put

18      the thing into evidence?

19  A    **Yes, sir.**

20  Q    Do you mark where you retrieved it from or anything

21      else like that?

22  A    **Yes, sir.**

23  Q    All right.  And you think that was done at the

24      scene, in this case?

25  A    **We have an evidence room at headquarters, so it**

Deputy Benjamin P. Fields - 11/12/2009
Carlos and Tashiana Martin v. Leon Lott, et al.

62

1     could have been taken to headquarters and the -- it

2     might have been filled out there.  As far as where

3     it was filled out, I really don't know.

4  Q  Okay.

5  A  It could have been done at the scene.

6  Q  Do I understand you to say that you did not have --

7     Well, let me ask you this.  Did you have any other

8     contact with Tashiana Martin after her being placed

9     in, I think the records suggest, Officer Gore's

10    car?

11 A  Okay.  I don't remember.  I really don't.  Nothing

12    that I recall.

13 Q  Do you remember anything that she said to you

14    during that time?  Did she say anything to you?

15 A  I really don't remember.

16

17    MR. MILLS: Deputy Fields, that's all the questions

18          I have for you at this time.  Ms. Harrison may

19          ask you some questions and your attorney will

20          have an opportunity.  I'm not going to promise

21          you I won't say anything again.  Thank you.

22          Appreciate it.

23    MS. HARRISON: Robby, just for the record, I don't

24          know if I'm going to introduce these pictures

25          as evidence.

Deputy Benjamin P. Fields - 11/12/2009
Carlos and Tashiana Martin v. Leon Lott, et al.

63

1           MR. GARFIELD: Okay.

2      MS. HARRISON: But these are pictures from Quail Run

3           Apartments showing like the kind of a sequence

4           of where we believe the cars were located.  Do

5           you want to take an opportunity to look at

6           these pictures with your client?

7      MR. GARFIELD: Since I haven't even seen them, I

8           would like that opportunity.

9      MS. HARRISON: Yes.  All right.  Well, all right.

10     MR. GARFIELD: Yes.  Thank you.  Do you want to do

11          this now?

12     MS. HARRISON: Yeah.  I wanted to just offer it up.

13     MR. GARFIELD: I appreciate that.

14     MS. HARRISON: But I haven't decided yet, but if you

15          want to, you know.

16     MR. GARFIELD: I appreciate that.  This is only

17          several pictures.  Should be very brief.

18          Thank you.

19

20                    (Short Break)

21

22                    EXAMINATION

23   BY MS. HARRISON:

24   Q    My name's Erika Harrison and I represent Carlos

25        Martin in this case.  So I wanted to make sure that

Deputy Benjamin P. Fields - 11/12/2009
Carlos and Tashiana Martin v. Leon Lott, et al.

64

1     was clear for you as to who I was.  And down the

2     way is Charles Bonner, and he's representing Mr.

3     Martin in this case.  He's not been pro hoc'ed into

4     this case, but, yet, he's representing him.  But it

5     will just be you and I this morning, all right.

6          Now, the first thing I want to go to is back

7     to your original statement you have in front of

8     you, the one that you prepared for Internal

9     Affairs, correct?

10  A   **Yes, ma'am.**

11  Q   All right.  Let's go to the last page of your

12     statement.  And I just want to get some things on

13     the record and make sure I'm absolutely clear as to

14     some of the things that occurred after you had

15     arrested Mr. Martin, all right.

16  A   **Yes, ma'am.**

17  Q   Now, at the time when you had arrested Mr. Martin

18     and which -- he was -- which vehicle was he in?

19     Was he in your patrol car?

20  A   **I believe he was, yes.**

21  Q   So he was sitting in your patrol car.  He was in

22     the back seat?

23  A   **I believe he was in mine, yeah.**

24  Q   And the door was open at the time?

25  A   **No, not if he was in the back seat.  No, ma'am.**

Deputy Benjamin P. Fields - 11/12/2009
Carlos and Tashiana Martin v. Leon Lott, et al.

65

1    **The door would not be open.**

2  Q  So he wasn't sitting -- He wasn't -- So when he --

3     When you placed him -- Who placed him in your

4     patrol car?

5  A  **Probably Deputy Smith did.  Again, I don't know for**

6     **sure.  But I think Deputy Smith because that's the**

7     **one who once we handcuffed him up, we got up and**

8     **Deputy Smith took control of him.**

9  Q  So Deputy Smith placed him in the patrol car.  Did

10    you over hear Mr. Martin say anything to you or to

11    any of the other deputies that were at the scene?

12 A  **I mean, in reference to say anything at all?**

13 Q  Say anything at all to you.

14 A  **I mean, he was saying things.  I don't know**

15    **verbatim what he was saying.**

16 Q  Well, after you had taken control of him, arrested

17    him and had him handcuffed and sitting in the

18    patrol car, had he calmed down, to your knowledge?

19 A  **He was calm, then he was irate and then he was calm**

20    **and he was irate.  So it's kind of back and forth.**

21 Q  Well, all right --

22 A  **One minute he would be calm and the next minute he**

23    **would be at it again talking.**

24 Q  Well, if he's at it again talking, what are the

25    things that's saying as he's talking?

Deputy Benjamin P. Fields - 11/12/2009
Carlos and Tashiana Martin v. Leon Lott, et al.

66

1   A   Let me refer to my report here. I have here in my

2      Internal Affairs statement that Mr. Martin

3      continued to run his mouth while in my patrol car

4      and laughing saying God was with him.

5   Q   So he's -- He's continuing to run his mouth. What

6      is he saying?

7   A   I don't know. I don't have that documented.

8   Q   And the only thing that you recall was him saying

9      God was with him?

10   A   That's what I have in my statement, yes, ma'am.

11   Q   And that's all you actually can recall at this time

12      and that's all you could recall on the day that you

13      wrote this statement?

14   A   I believe so.

15   Q   Now, you engage Mr. Martin while you are in the

16      patrol car, is that correct?

17   A   While I'm in -- I'm sorry?

18   Q   While you're in the patrol car --

19   A   While he's in the patrol car.

20   Q   While he's in the patrol car and you're in the

21      patrol car, do you engage Mr. Martin further?

22   A   I was not in the patrol car at the same time he was

23      in the patrol car, I don't believe.

24   Q   All right. So did you ever make a statement to the

25      effect that you are glad that Johnnie Cochran is

Deputy Benjamin P. Fields - 11/12/2009
Carlos and Tashiana Martin v. Leon Lott, et al.

67

1      dead?

2   A   **I did make that statement.**

3   Q   You did make that statement?

4   A   **Yes, ma'am.**

5   Q   And you made that statement directly to Mr. Martin?

6       And you're referring back to your IA?

7   A   **Yeah.  My question and answer from IA, that's**

8       **correct.**

9   Q   There's nothing to dispute about the fact that you

10      made the statement, is that correct?

11  A   **That's correct.**

12  Q   And are you glad that Johnnie Cochran is dead?

13

14      MR. GARFIELD: Object to the form.  Go ahead.

15

16  A   **No, ma'am.**

17  Q   So what was the intent behind the statement?

18  A   **At the time I made the statement, Mr. Martin,**

19      **according to my -- again, according to my question**

20      **and answer here, was talking about getting Jack**

21      **Swerling and -- who is a good defense attorney.**

22      **And we all know who Johnnie Cochran is.  He's a**

23      **very popular defense attorney.  And I made the**

24      **statement.**

25  Q   And you made the statement --

Deputy Benjamin P. Fields - 11/12/2009
Carlos and Tashiana Martin v. Leon Lott, et al.

68

```
 1
 2          MR. GARFIELD: Were you through with your answer?
 3              I'm sorry, Erika.
 4
 5     A    Yeah, I'm through with my answer.
 6
 7          MR. GARFIELD: Okay.  Thank you.
 8          MS. HARRISON: You're through with the answer.
 9
10     Q    And you made the statement that you're glad that
11          Johnnie Cochran is dead.
12     A    Because they might get him if he was not.
13     Q    They might get him if he was not.
14     A    Uh-huh.
15     Q    And so that was it?  That's all -- Your whole
16          intent behind that was saying that, essentially,
17          too bad he's dead because you could get him?
18     A    The intent behind was that as well as we all know
19          who Johnnie Cochran is.  He's a good defense
20          attorney.  Mr. Martin was talking defense lawyers
21          at the time.  He was talking about Jack Swerling at
22          the time.  And so I made that statement.  And
23          because we all know who Johnnie Cochran is.
24     Q    Is that a professional statement to make to a
25          subject?
```

Deputy Benjamin P. Fields - 11/12/2009
Carlos and Tashiana Martin v. Leon Lott, et al.

69

 1    A    No, ma'am.

 2    Q    All right.  So when -- Let's drop back down here to

 3         the last paragraph right here.  You said, "The

 4         situation was handled as professional as possible

 5         because of my training and patience the only people

 6         injured was Deputy Clarke and myself, and that was

 7         because of the concrete that we cut our hands on."

 8              Now, there's a lot in that sentence, a lot of

 9         different things going on.  But you would agree

10         with me that in that instance, you did not handle

11         Mr. Martin professionally when you said to him --

12    A    Well, I'm not even sure

13    Q    -- you are glad that --

14

15         MR. GARFIELD: Let her finish her question.

16

17    Q    -- Johnnie Cochran is dead.

18    A    I'm not even sure I was talking to Mr. Martin at

19         the time when I made that statement.

20    Q    Well, then who were you talking to?

21    A    The other deputies in the area.

22    Q    So let me -- Let's back up now because now I'm a

23         little confused as to what you're -- how this all

24         comes about.  Mr. Martin is saying what about

25         attorneys?

Deputy Benjamin P. Fields - 11/12/2009
Carlos and Tashiana Martin v. Leon Lott, et al.

70

1 A Again, as I remember it, is he was talking about in

2   reference to getting attorney Jack Swerling, okay,

3   who we know who that is as well.  And then I made a

4   comment, because we were on the back of the hood or

5   the trunk doing paperwork, and I made a comment

6   with other deputies -- to other deputies about

7   Johnnie Cochran.

8 Q The comment that you specifically made was you're

9   glad that Johnnie Cochran is dead.

10

11   MR. GARFIELD: Object to the form.  Asked and

12    answered.  Go ahead.

13

14 A I said that, yes.

15 Q No, I mean, that was -- My question was, though,

16   the comment that you made directly to these

17   deputies was you're glad that Johnnie Cochran is

18   dead.

19 A Correct.

20 Q And who are these two deputies that you made the

21   statement to?

22 A Well, there was a lot of deputies out there, so I

23   don't recall.

24 Q Well, I agree with you that there a number of

25   deputies out there at the time.  But that became a

Deputy Benjamin P. Fields - 11/12/2009
Carlos and Tashiana Martin v. Leon Lott, et al.

71

1      statement that you made to two deputies that you

2      said that you made to two deputies.

3  A  **No, I said to deputies at the -- If I said two then**

4      **what I'm saying is there was a lot of deputies out**

5      **there. To -- I said -- I'm sorry. I made to**

6      **deputies; not two deputies. I didn't mean two the**

7      **number two. I said to deputies.**

8  Q  So what deputies were -- So you were at the back of

9      your car -- Let me -- I'm just trying to understand

10    exactly how this comment came about.

11  A  **Okay.**

12  Q  You're at the back of your car; you're filling out

13     paperwork, right? That's yes?

14  A  **Yes, ma'am.**

15  Q  Yes. Right. So you're filling out the paperwork

16     and who's assisting you with the paperwork at the

17     time?

18  A  **Several officers. I don't remember all who was**

19     **back there. We had a couple.**

20  Q  Couple, several? Couple is two; several is more

21     than two.

22  A  **Well, we had a --**

23

24     MR. GARFIELD: Is that question? Or you just

25       telling him.

1

2    Q    I just want to know was it two or more than two?

3

4         MR. GARFIELD: Thank you.

5

6    A    **It was definitely more than two.**

7    Q    And you overhear Mr. Martin and then this comment,

8         then you make your comment about Johnnie Cochran

9         being dead?

10   A    **That's correct.**

11   Q    All right.  Now, after that comment that you made

12        to these deputies about Johnnie Cochran, you are

13        glad that Johnnie Cochran is dead, did you make any

14        other comments in reference to Mr. Martin or to Mr.

15        Martin?

16   A    **I could have.**

17   Q    Well, --

18   A    **I'm not sure.**

19   Q    Did you?

20   A    **I'm not sure.  Are you referring to something**

21        **specifically?**

22   Q    Well, I mean, you've had an opportunity to read all

23        your statements, right?

24   A    **Right.**

25   Q    All right.  So you've had a time to talk this out

```
 1        and to recall all the events of that incident,

 2        right?

 3   A    All the events as best to my knowledge.

 4   Q    Right.  All right.  So let's drop down to your

 5        statement on the last paragraph in the last page.

 6        It says, "I did reply you're going to need a good

 7        lawyer because your career is pretty much over."

 8        Did you make that statement to Mr. Martin?

 9   A    Where are you raftering to?

10   Q    I'm referring to the second page, last paragraph --

11        the large block paragraph before the last one, the

12        last line.

13   A    Okay.  I was answering in the sense that Mr.

14        Martin, after he was being switched to the paddy

15        wagon saying he has a good lawyer, he's not worried

16        about anything and how he will get off the charges.

17        And I did reply you're going to need a good because

18        your career is pretty much over.  So yeah, that was

19        a rebuttal to something that he had said to me.

20        That's correct.

21   Q    So you're continuing to engage Mr. Martin after

22        he's been in handcuffs, after you're about to put

23        him on the paddy wagon, and you're still continuing

24        to engage Mr. Martin, is that correct?

25
```

Deputy Benjamin P. Fields - 11/12/2009
Carlos and Tashiana Martin v. Leon Lott, et al.

74

| | | |
|---|---|---|
| 1 | | MR. GARFIELD: Object to the form question. Go |
| 2 | | ahead. |
| 3 | | |
| 4 | A | **I think we were talking back and forth.** |
| 5 | Q | So at that time that you make this comment that |
| 6 | | your career is pretty much over, is that a |
| 7 | | professional comment to make to this person? |
| 8 | | |
| 9 | | MR. GARFIELD: Object to the form. Go ahead. |
| 10 | | |
| 11 | A | **I was letting him know he was in the military and** |
| 12 | | **his actions were uncalled for and the military** |
| 13 | | **doesn't put up with that kind of stuff. So I was** |
| 14 | | **letting him know that if convicted, he was going to** |
| 15 | | **be in some trouble, yeah. Absolutely.** |
| 16 | Q | So you're letting him know if he's convicted, it's |
| 17 | | that he could be in trouble. But this doesn't say |
| 18 | | any -- "if" is a conditional word, right? Would |
| 19 | | you agree with me "if" is a conditional word? |
| 20 | A | **It could be. I don't know.** |
| 21 | Q | Well, let's just say, for instance, "if" is a |
| 22 | | condition. So if something happens, this could |
| 23 | | happen, right? |
| 24 | A | **Correct.** |
| 25 | Q | All right. So you would agree so that's how that |

1      sentence would work.  So if you are convicted, your

2      career is over.  So the end result is the career

3      could be over if he's convicted, right?

4

5      MR. GARFIELD: Object to the form.  Go ahead.

6

7   **A**   **Could be.**

8   Q   Does that sentence imply a condition that if he's

9      convicted, his career is over?

10

11      MR. GARFIELD: Same objection.

12

13   **A**   **No.  But, again, I was -- after what he had said, I**

14      **was speaking back to him.**

15   Q   At this time, are you making an affirmative

16      statement to him that his career is pretty much

17      over?

18

19      MR. GARFIELD: Same objection.  Go ahead.

20

21   **A**   **I mean, it's clear I said it.  It's in my**

22      **statement.**

23   Q   So, yes, you made the affirmative statement that

24      his career was pretty much over at the time that

25      you were placing him in the paddy wagon?

Deputy Benjamin P. Fields - 11/12/2009
Carlos and Tashiana Martin v. Leon Lott, et al.

76

1   A   I made the statement to him.

2

3       MR. GARFIELD: Same objection.

4       MS. HARRISON: He was answering and then you were

5           objecting.

6

7   Q   So I want the record to be clear that are you --

8       you're answering yes to my question?

9   A   No.  I said I made the statement.

10  Q   You made the statement.

11  A   I made the statement.  You're going to need a good

12      lawyer because your career is pretty much over, I

13      made that statement, yes.

14  Q   Let's travel back to this very beginning of this

15      day on October 24, 2005.  You're dispatched out

16      there, right?

17  A   Correct.

18  Q   To Quail Run.

19  A   Correct.

20  Q   Now, you're out there for the -- What's the purpose

21      of you being out there?

22  A   I was dispatched to the location in reference to a

23      suspicious person hanging around.

24  Q   Do you recall what that description of that

25      suspicious person was?

Deputy Benjamin P. Fields - 11/12/2009
Carlos and Tashiana Martin v. Leon Lott, et al.

77

1    A    I do not.

2    Q    So you don't know if the call was for a suspicious

3         white male?

4    A    I don't know what the suspicious -- what the

5         description was of the suspicious person.  I don't

6         recall.

7    Q    Is there any type of recording of that or the

8         dispatch call on that, do you know?

9    A    I believe so, yes.

10   Q    And that description would have been in that

11        dispatch call, probably?

12   A    It could have been.  It might not have been.

13        Sometimes we get descriptions; sometimes we don't.

14   Q    So how --

15   A    If somebody calls a suspicious person in and we

16        might get description, a very detailed description,

17        we might not get a description at all.

18   Q    So it could just be just a person . . .

19   A    Yeah.  And they're hanging out by a certain place

20        or something like that.

21   Q    All right.  So where were you at the time prior to

22        coming over to Quail Run, do you know?

23   A    I have no idea.

24   Q    So you arrive at Quail Run.  What's -- You enter

25        the complex and where do you start traveling?  Do

1      you -- are you familiar with the Quail Run

2      apartment area?

3

4      MR. GARFIELD: Object to the form.  Go ahead.

5

6   A  **Yes, somewhat.  Yeah.**

7   Q  You are familiar with that area before?

8   A  **Uh-huh.**

9

10     MR. GARFIELD: Hold on.  Is that a yes?

11

12  A  **Yes.**

13  Q  And have you reported to the Quail Run apartment

14     complex before?

15  A  **I have.**

16  Q  Have you reported back to the Quail Run apartments

17     after this incident?

18  A  **I'm sure I have.**

19  Q  So you're familiar with somewhat the layout of the

20     Quail Run apartment complex?

21  A  **For the most part, yeah.**

22  Q  So you go into the Quail Run apartment complex and

23     do you just started traveling around or do you go

24     to a specific area?

25  A  **Just driving around.**

1    Q    You're just driving around. How long do you think

2        you've been driving around in the Quail Run

3        apartments?

4    **A**    **I don't remember.**

5    Q    Now, you start driving around this area looking for

6        this particular suspicious person and then all of a

7        sudden you hear some loud music, is that right?

8    **A**    **Correct.**

9    Q    All right. So the loud music distracts you from

10       the intended purpose of you actually being there?

11    **A**    **No.**

12    Q    So tell me exactly why you stopped looking for the

13       suspicious person and then switched over to the

14       loud music, identifying where the loud music was

15       coming from.

16    **A**    **Ask the question one more time.**

17

18       MS. HARRISON: What was my question?

19       COURT REPORTER: So tell me exactly why you stopped

20            looking for the suspicious person and then

21            switched over to the loud music, identifying

22            where the loud music was coming from.

23

24    Q    So, again, what made you stop looking for -- Was

25       the loud music the reason why you stopped looking

80

```
 1          for the suspicious person?
 2    A     No.  My job is to enforce the law, no matter what
 3          that is; no matter where I'm at.  So the loud music
 4          was obviously a noise ordinance, breaking the law.
 5          So I don't think I -- I don't think it was about me
 6          stopping looking for the suspicious person.  That
 7          never really crossed my mind.  I just knew that I
 8          heard loud music coming from somewhere and I needed
 9          to deal with that at that in point in time.
10    Q     You needed to deal with the loud music -- The loud
11          music is a misdemeanor, correct?  It's a city --
12          It's a county ordinance?
13    A     That's correct.
14    Q     And the suspicious person, though, even though you
15          don't what the suspicious person might be doing,
16          they could be doing a felony, right?  I mean,
17          that's possible?
18    A     I don't know.  I don't know.
19    Q     But is it possible?
20    A     It's possible that the person with the loud music
21          may be doing a felony.  I don't know.
22    Q     Well, at the time, though, --
23
24          MR. GARFIELD: Was that funny, Chris?
25          MR. MILLS: That was hilarious.  It was a joke.  I
```

Deputy Benjamin P. Fields - 11/12/2009
Carlos and Tashiana Martin v. Leon Lott, et al.

81

```
1              really didn't realize it was -- that really
2              was funny in my mind, thanks.
3    MR. GARFIELD: Okay.
4    MR. BONNER: I'm sorry.  I'm just laughing because
5              you're laughed, Chris.
6
7  Q  Well, going back to what I was originally asking.
8     A person breaking a misdemeanor county ordinance
9     versus a suspicious person who you don't know what
10    they're doing, did that take priority?
11 A  At the time, yes.
12 Q  And a suspicious person who could have possibly be
13    committing a felony took priority, was actually --
14    Excuse me.  Strike that question.
15       A county ordinance noise disturbance took
16    priority over the search of a suspicious person who
17    could be committing a possible felony?
18
19    MR. GARFIELD: Object to the form.  Go ahead.
20
21 A  I had no reason to call -- If I had a reason to
22    think that suspicious person was committing a
23    felony or that's how the call went out, then
24    obviously there is priority calls that we take,
25    okay, if that's you're getting at.
```

Deputy Benjamin P. Fields - 11/12/2009
Carlos and Tashiana Martin v. Leon Lott, et al.

82

1   Q   Uh-huh.

2   A   I had no reason to think the suspicious person was

3       doing that.  I had driven around the apartment

4       complex, all right.  I had checked the scene out.

5       I didn't see the suspicious person, which is a very

6       normal -- a very normal thing.  We get calls about

7       suspicious people all the time.  Sometimes you

8       discover them.  Sometimes you do; sometimes you

9       don't.  And at that point in time when I was

10      finishing up the suspicious person call is when the

11      loud music situation came upon me.  And I had no

12      reason to think the suspicious person was

13      committing a felony because that's not how the call

14      went out.

15  Q   So loud music comes upon you.

16  A   Uh-huh.

17  Q   All right.  And you're in the complex.  Are you

18      driving -- You're driving around, right?

19  A   In the complex?

20  Q   Uh-huh.  You're driving around.

21  A   At that -- Okay.  When I heard the loud music, I

22      had stopped my patrol car trying to figure out

23      where this music was coming from at the time.

24  Q   So how long did you stop your patrol car to

25      determine?

Deputy Benjamin P. Fields - 11/12/2009
Carlos and Tashiana Martin v. Leon Lott, et al.

83

1   A   Let's see.  I'm going to refer back to my report.

2       It looks like it says after about a minute or so is

3       when I saw the white Ford Explorer that was playing

4       the loud music.

5   Q   So about a minute.  So are we -- If I was to sit

6       here for one minute just stopped, no noise, is --

7       Let's just time that.  Just for one minute.

8

9       MR. GARFIELD: I got you.

10      MS. HARRISON: All right.  Let's just stop for one

11          minute.

12      MR. GARFIELD: We'll start right now.

13              (Period of silence taken)

14      MR. GARFIELD:  It's 30 seconds, if you're

15          interested.

16      MS. HARRISON: We'll stop at 50 seconds because he

17          said about a minute.

18      MR. GARFIELD: However you like.  Now 50 seconds.

19

20  Q   All right.  So for that amount of time, you waited

21      to determine where the loud music was coming from?

22  A   According to my report, yes.

23  Q   Fifty seconds.  And that was -- That's a good bit

24      of time, right?

25  A   I guess.  I mean, it can be.

Deputy Benjamin P. Fields - 11/12/2009
Carlos and Tashiana Martin v. Leon Lott, et al.

84

1  Q  For loud music.

2  **A**  **I mean, --**

3

4  MR. GARFIELD: Object to the form.  Go ahead.

5

6  **A**  **I've been in apartment complex where it might take**

7      **you a couple of minutes sometimes to find where the**

8      **loud music is coming from.  That's very possible.**

9  Q  No one called to ask you -- No one called or said I

10     have a loud music disturbance in Quail Run, did

11     they?

12  **A**  **Huh-uh.  No, ma'am.**

13  Q  So you sat out in Quail Run for almost a minute

14     listening for a thumping bass sound, right?

15

16  MR. GARFIELD: Object to the form.  Go ahead.

17

18  **A**  **I was listening for where the extremely loud music**

19     **that I heard was coming from.**

20  Q  Extremely loud music.

21  **A**  **Yeah.**

22  Q  All right.  Was it thumping bass?

23  **A**  **Yeah, it's usually what we deal with, yes.**

24  Q  And you were trying to figure out -- It could have

25     been coming from the street that runs in front of

```
 1           Quail Run, is that right?
 2    A      It could have been coming from the apartment, it
 3           could have been coming from a lot of places.
 4           That's correct.
 5    Q      So you couldn't determine exactly the location of
 6           where this thumping bass sound was?
 7    A      That's correct.
 8    Q      So at that moment in time, after that about 50
 9           second period as you're waiting for loud music, do
10           you see Mr. Martin?
11    A      White Ford Explorer -- Let me see here.  Came
12           driving around the corner playing extremely loud
13           music.
14    Q      What type of extremely loud music?
15    A      I know the bass was thumping.  Just what you said.
16           I mean, it was loud thumping bass music.  I mean,
17           that could be a variety of music.
18    Q      Now, tell me about the county ordinance a little
19           bit.  And just a little education on that for me.
20           Is your determination of what is extremely loud
21           subjective?
22    A      Yeah.
23    Q      And what do you base extremely loud on?
24    A      If it -- I mean, if it's disruptive to the
25           community in any way, shape or form or could be
```

Deputy Benjamin P. Fields - 11/12/2009
Carlos and Tashiana Martin v. Leon Lott, et al.

86

1    disruptive to the community.

2  Q  Or could be, okay.  So was this thumping bass

3     rattling the windows in your patrol car?

4  A  Rattling my windows?

5  Q  Yeah.

6  A  Typically my -- windows that rattle are windows

7     that are loose.  It wasn't rattling my windows.

8  Q  Could you feel the thumping bass?

9  A  I could.

10 Q  So you felt thumping base, okay.

11 A  I could.

12 Q  So you could -- So not only you hear it, you could

13    feel it.  So what level is thumping bass at if you

14    can actually feel it while sitting in your car for

15    50 seconds?

16 A  I don't understand the question.

17 Q  Well, I mean, do you know what the levels are?  I

18    mean, what's -- I mean, do you know what decibels

19    are?

20 A  Yeah, I know what decibels are, but I don't what

21    level it was at, if that's what you're asking.

22 Q  Now, was this thumping bass sound, you heard it,

23    but, you know, as you -- and, you know, -- And I

24    need to pontificate a little bit about this.

25       As you hear sounds in cars, cars are

```
 1          traveling, they're moving.  So tell me about this
 2          thumping bass sound.  How -- Was it traveling?  Did
 3          it increase?  Did it decrease?  Tell me about it.
 4    A     Well, it increased as it got closer to me.
 5    Q     It increased, okay.
 6    A     Yeah.
 7    Q     And so at what intervals did it start to increase?
 8          Because we've got 50 seconds on the record now, so
 9          what intervals did it start to increase?
10    A     I'm not sure.
11    Q     Did it start to increase every five seconds?
12    A     I don't remember.
13    Q     Ten seconds?
14    A     I don't remember.
15    Q     So it's increasing but you don't know the graduated
16          level at which it was increasing when the car --
17          when you finally determined that it was Mr. Martin?
18    A     No, ma'am.
19    Q     Now, you said -- I'm going to just actually pull
20          out a piece of paper.  Like we've agreed that
21          you're somewhat familiar with the Quail Run
22          complex, right?
23    A     I am.
24    Q     So is it fair to say that you can possibly do a
25          diagram of where you were at the time that you saw
```

```
 1        Mr. Martin's car?
 2   A    No, ma'am.
 3   Q    You can't?
 4   A    I don't recall.  This -- What's the date on this?
 5        '05?
 6   Q    Uh-huh.
 7   A    Yeah.  I'm not -- I don't feel comfortable doing
 8        that.
 9   Q    You don't feel comfortable doing the diagram of
10        where you were stationed at at the time that Mr.
11        Martin -- when you saw Mr. Martin?
12   A    I can't be sure.  So, therefore, I can't.
13   Q    Okay.  Now, obviously, you have had a ton of
14        arrests since -- well, we won't say ton because ton
15        is a measurement.  You've had a number of arrests
16        since October 24, 2005.  So I will agree with you,
17        you've had -- That's correct, right, you've made
18        several arrests since then?
19
20        MR. GARFIELD: Object to the form.  Go ahead.
21
22   Q    Have you made several arrests since October 24,
23        2005?
24   A    Yes, ma'am.
25   Q    All right.  In particular, this -- does this event
```

Deputy Benjamin P. Fields - 11/12/2009
Carlos and Tashiana Martin v. Leon Lott, et al.

89

1    on October 24, 2005, does this strike you as a

2    significant event or a non-significant event?

3  A  **It's one in many events that I've encountered over**

4    **what I think is now a long period of time.  So not**

5    **really significant to me, no.**

6  Q  Okay.  So this event, which you've actually been

7    served with a Complaint, a Summons and Complaint

8    with, isn't as significant as some of your other

9    arrests in which you've not been served Summons and

10    Complaints?

11

12    MR. GARFIELD: Object to the form.  Go ahead.

13

14  A  **I mean, I've looked over the paperwork a lot more**

15    **because I've had to because of the situation.  But**

16    **as far as me remembering certain details about that**

17    **day, where cars were placed, drawing diagrams,**

18    **things like that, I mean, I can't be sure about**

19    **those things.**

20  Q  All right.  So would it be fair to say you can't be

21    sure about what was said to -- what you said to Mr.

22    Martin?

23  A  **Well, what I have written down is what I can refer**

24    **to.**

25  Q  So the only thing that you can actually recall and

Deputy Benjamin P. Fields - 11/12/2009
Carlos and Tashiana Martin v. Leon Lott, et al.

90

1        the only thing that you're going hold yourself to

2        in this deposition is what you stated in this

3        report that you've written, correct?

4

5        MR. GARFIELD: Object to the form.

6

7    A   **Correct.  I can refer to my internal affairs, my**

8        **statement, question and answer as well as my police**

9        **report.**

10   Q   And also your trial transcript.

11   A   **Trial transcript.**

12   Q   And that's it?

13

14       MR. GARFIELD: Object to the form.

15

16   Q   As far as your ability to recall anything outside

17       of those documents?

18   A   **I mean, if you ask me a question that I know the**

19       **answer to, then, certainly, I'll answer it.  But if**

20       **I don't remember, I don't know or I can't be sure,**

21       **then I can only refer to this and see what that**

22       **says.**

23   Q   All right.  So you're unable to tell me where

24       exactly you were stopped when you saw Mr. Martin's

25       car?

1

2          MR. GARFIELD: Object to the form.

3

4    **A**    **I mean, I was stopped in the complex is all I can**

5          **tell you.  Exactly where, I don't remember.**

6    Q    Are you able to tell me exactly how far away you

7          were from Mr. Martin when you approached him?

8    **A**    **Let's see what's in my report here.  So are you**

9          **referring to when he got out of his car?**

10   Q    I'm just referring in general.  I mean, out of all

11         these reports, do any of these reports tell you, or

12         can you recall personally, how far you were from

13         Mr. Martin when you approached him?

14   **A**    **No.  But in my question and answer, I know when I**

15         **approached him he was walking very fast away from**

16         **his vehicle, so I had to get his attention quickly.**

17         **That's all I know.**

18   Q    Are you going to be able to tell me what type of ID

19         he presented to you?

20   **A**    **I think that is written somewhere.**

21   Q    Actually, let me strike that question.  Are you

22         going to be able to recall what type of ID he

23         presented to you if you are shown the type of ID's

24         he might have presented to you?

25

Deputy Benjamin P. Fields - 11/12/2009
Carlos and Tashiana Martin v. Leon Lott, et al.

92

1          MR. GARFIELD: Object to the form.

2

3    A     **No.  But I do have it written down here, I believe**

4          **somewhere.  I believe somewhere he presented me a**

5          **military ID.**

6    Q     Are you going to be able to recall the maneuvers

7          that you made in order to take Mr. Martin under

8          control and attempt to arrest him at the time?

9    A     **If I look at my use of force, absolutely.**

10   Q     Are you going to be able to recall exactly what you

11         said to Mr. Martin when you were on top of him with

12         your -- with his knee in your -- in the small of

13         your back?

14

15         MR. GARFIELD: Object to the form.

16

17   Q     In the small of his back?

18

19         MR. GARFIELD: Same objection.  Go ahead.

20

21   A     **If it's written down, ma'am, I'm sure I can.  I**

22         **mean, I don't remember what was said to him when I**

23         **was on top of him.  But if I have it written down,**

24         **yes, I can refer to it.**

25   Q     All right.  I just wanted to make sure what you

1       have in the scope of your personal knowledge versus

2       what you have in written down.  And so I just want

3       to make sure if there are some things that I might

4       ask you that you might not be able to recall

5       because it's not in front of you or you just don't

6       have personal knowledge.

7  **A**  **Some things I'll be able to recall; some things I**

8       **may not.  Some things I'll have to refer to my**

9       **notes.**

10  Q  All right.  Well, let's just go back up.  Now,

11       wherever you were stopped in Quail Run that you

12       don't recall exactly specifically, perhaps you can

13       recall for me how it was that you were able to see

14       Mr. Martin bobbing his head up and down.  What was

15       the positioning of your vehicle?  Were you facing

16       Mr. Martin?  Was he t-bone to you?  How was -- What

17       was the positioning for you to be able to see him

18       bobbing his head up and down?

19  **A**  **I was positioned as to go out of the complex, so I**

20       **was facing -- Again, I mean, it's one thing where**

21       **he was coming this way; I'm going this way.  So my**

22       **car's stopped here, so I'm facing this way and he's**

23       **coming this way.  And as he passes my car, I know**

24       **he's bobbing his head up and down.**

25  Q  So he's approaching you.  You are approaching him -

Deputy Benjamin P. Fields - 11/12/2009
Carlos and Tashiana Martin v. Leon Lott, et al.

94

1          --

2     A    No, I'm stopped.

3     Q    Huh?

4     A    I'm stopped at that point.  I'm just trying --

5     Q    You're stopped --

6     A    -- make it clear which way I'm facing.  That's all.

7     Q    You're stopped and he's approaching you?

8     A    Correct.

9     Q    All right.  Are y'all actually in the -- y'all are

10         on the same road?

11    A    It's not a road.  It was a parking lot.

12    Q    All right.  Are there parking spots in between the

13         two of you?

14    A    I don't recall.

15    Q    This photograph that I -- I think they're with me.

16         Yeah, they are with me.  I'm going to show you a

17         photograph, and I will tell you that this is the

18         white Ford Explorer that you saw and the BMW is

19         going to be representative of your vehicle, okay?

20    A    Okay.

21    Q    All right.  I know that patrol cars are not BMW's,

22         so.  I understand that.  But the white Ford

23         Explorer is the Ford Explorer that you saw.

24

25         MR. GARFIELD: And I'm going to object to the form,

Deputy Benjamin P. Fields - 11/12/2009
Carlos and Tashiana Martin v. Leon Lott, et al.

95

1            and specifically the characterization of the

2            representations that you made preceding to

3            this question.

4       MS. HARRISON: About a BMW is not a patrol car?

5       MR. GARFIELD: That's all I'll say.  I don't want to

6            suggest an answer.  So I'll just go ahead and

7            put that down.

8       MS. HARRISON: Okay.

9       MR. GARFIELD: I mean, I could tell you or I can

10           shut up.  But I just -- didn't want to suggest

11           an answer to him, but I want to put on the

12           record that I object.

13      MS. HARRISON: Well, what's the -- I guess I'm

14           trying to understand what your objection is.

15           Are you objecting to the photograph or are you

16           objecting -- What the objection is?

17      MR. GARFIELD: Your characterization of what he saw

18           in the photograph.  I think you said that I

19           would represent to you that this is the car he

20           saw and these were these positions.  I object

21           to the characterization.  But the question

22           itself, to the form.

23      MS. HARRISON: Okay.

24      MR. GARFIELD: Thank you.

25

```
 1   Q   Well, I'm going to show you a photograph.  I'm

 2       going to show you a photograph.  Is this the white

 3       Ford Explorer that you saw on the day of October

 4       24, 2005?

 5   A   I don't know.

 6   Q   You don't know.  Did you -- But you would agree

 7       with me you saw a white Ford Explorer.

 8   A   That's correct.

 9   Q   All right.  Is this the vicinity or the distance

10       between your patrol car, and I'll represent to you

11       there's the BMW right there.  That is

12       representative of your patrol car.  And this is the

13       white Ford Explorer.  Is this representative of the

14       distance between you and Mr. Martin at the time

15       that you saw him bobbing his head up and down?

16

17       MR. GARFIELD: Object to the form.  Go ahead.

18

19   A   No, ma'am.

20   Q   All right.  Tell me what's not correct about that

21       photograph?

22   A   First of all, the angles aren't even right.  I

23       mean, -- So you're just asking the distance,

24       correct?

25   Q   Right.
```

```
 1   A   Okay.  He would need to be -- I mean, he was almost
 2       on top of me.  That's --
 3   Q   All right.  So in between here are parking spaces.
 4       I'll represent --
 5   A   Yeah, there was no parking space between us.
 6   Q   All right.  So is it a single roadway?
 7   A   It's tough to even try to describe it.  But the
 8       point is, is that he was about this close to my
 9       car.
10   Q   So what's this close?
11   A   I mean, we're talking, you know, two, three feet.
12       We're talking very close.  Very close.
13   Q   So he would be about the distance that one would be
14       if there was, you know, the little dashed lines or
15       a solid line --
16   A   He wasn't even that far from me.  He was very
17       close.  I mean, I don't have a ruler.  I can't
18       measure it out.  But I'm telling you, he's very
19       close.  You say what's very close?  I mean, that's
20       tough to say, but he was very close.
21   Q   Okay.  So he's very close to you.  So you see him;
22       he sees you.  As you state, you made eye contact
23       with him.  Did you make eye contact with him?
24   A   Let me look here.  In my report it says he looked
25       at me.  As far as eye contact, I don't see that
```

```
 1        anywhere, unless it's in my Internal Affairs
 2        statement.
 3   Q    Well, let's just --
 4
 5        MR. GARFIELD: Erika, can I just ask for the
 6             deponent to take his time if he's --
 7        MS. HARRISON: Absolutely.
 8        MR. GARFIELD: Thank you.
 9        MS. HARRISON: Absolutely.
10
11   A    Yeah.  I have nowhere that he made eye contact with
12        me.
13
14        MR. GARFIELD: Go ahead.  Keep going.
15
16   A    All I have is that he looked at me.
17   Q    He looked at you.
18   A    Yeah.
19   Q    All right.  And you also say he doesn't turn off
20        his music.  At that time, had you indicated to him
21        -- In your report it says and did not turn off his
22        -- turn his music off.  Excuse me.  That's not -- I
23        misstated what your statement said.  Did not turn
24        his music off.  At that time, had you at any point
25        in time indicated to him to turn off his music?
```

Deputy Benjamin P. Fields - 11/12/2009
Carlos and Tashiana Martin v. Leon Lott, et al.

99

1   A    No, because at that point in time, he drove past

2          me, I had to turn my patrol car around to make

3          contact with him.

4   Q    And when he bobbed his head up and down, did you

5          think he was taunting you?

6   A    I think it's a form of taunting, sure.

7   Q    All right.  Well, tell me what you -- Define

8          taunting for me.

9   A    I mean, it could be.  I can't --

10   Q    That was --

11   A    I can't define it for you, but it could be

12          taunting, yes.

13   Q    Well, what do you mean you can't define taunting

14          for me?  I mean, it's your words, right?

15

16          MR. GARFIELD: Object to the form.

17

18   Q    Did you consider Mr. Martin taunting you?

19   A    Yes.

20   Q    Define for me what taunting means to you.

21

22          MR. GARFIELD: Object to the form.

23          MS. HARRISON: What's the objection?  It's based on?

24          MR. GARFIELD: I don't have to tell you.

25          MR. MILLS: You do have to make an objection in good

Deputy Benjamin P. Fields - 11/12/2009
Carlos and Tashiana Martin v. Leon Lott, et al.

100

1          faith, Robby.

2          MR. GARFIELD: It's a good faith objection, Chris.

3              I don't have to state the grounds.  She can

4              elect to cure the question or not.

5

6    A    I think taunting to me is just when you know you're

7         doing something you shouldn't do and you're just

8         kind of rubbing it in type deal.

9    Q    All right.

10   A    Saying, you know, I dare you.  You know, I'm going

11        to get away with this type thing.  That's what

12        taunting is to me in that particular situation.

13        And I can give you other examples, too.  That

14        particular situation, that's what I thought about.

15   Q    How many times did Mr. Martin bob his head up and

16        down?

17   A    I don't remember.

18   Q    So you don't know if it was one bob, two bobs,

19        three bobs?  Could he possibly have been bobbing to

20        the music?

21   A    My guess would be that's probably what he was

22        bobbing his head to.

23   Q    So he's bobbing his head to the music, but --

24   A    While he looked straight at my patrol car.

25   Q    He looked at your patrol car.

Deputy Benjamin P. Fields - 11/12/2009
Carlos and Tashiana Martin v. Leon Lott, et al.

101

| | | |
|---|---|---|
| 1 | A | Or looked at me in the patrol car. |
| 2 | Q | All right. If someone looks at you while you're in |
| 3 | | your patrol car while bobbing their head up and |
| 4 | | down to music that they're listening to, you |
| 5 | | considered that to be taunting? |
| 6 | A | When it's excessively loud, extremely loud, |
| 7 | | excessively loud. |
| 8 | Q | Did Mr. Martin know that it was excessively loud at |
| 9 | | the time that he looked at you? |
| 10 | | |
| 11 | | MR. GARFIELD: Object to the form question. |
| 12 | | |
| 13 | A | I don't know. I can't answer that. |
| 14 | Q | In your opinion, it was -- And, actually, you |
| 15 | | didn't use excessively loud. You used extremely |
| 16 | | loud. |
| 17 | A | Extremely loud. |
| 18 | Q | All right. Just make sure I was correct on what |
| 19 | | loud was to you. |
| 20 | A | Yes, ma'am. |
| 21 | Q | You hadn't indicated to him that his music was |
| 22 | | loud. You hadn't indicated to him that his music |
| 23 | | was loud. He might have been bobbing his head up |
| 24 | | and down to the music that he was playing. And he |
| 25 | | looked at you. And that -- And those are the only |

Deputy Benjamin P. Fields - 11/12/2009
Carlos and Tashiana Martin v. Leon Lott, et al.

102

1       actions -- those are the only things that you knew

2       were occurring at that particular time?

3

4       MR. GARFIELD: Object to the form.  Go ahead.

5

6   A   **That's why I turned my patrol car around to let him**

7       **know that his music was extremely loud.**

8   Q   All right.  Were there any other people that were

9       in the vicinity of the complex that might have been

10      standing outside of the complex?

11  A   **I didn't see anybody.**

12  Q   Did anybody -- And we've already established that

13      no one called in complaining about loud noise.

14  A   **Correct.**

15  Q   And you had an opportunity to look at some of the

16      paperwork in this case, correct?

17  A   **Yes, ma'am.**

18  Q   Not only just your statements, but you've -- have

19      you looked at other statements in this case?

20  A   **A couple, yeah.**

21  Q   Was the music loud enough that anyone standing

22      outside could have heard it?

23  A   **Yes.**

24  Q   How far away if someone was standing -- How far

25      away could that music have been heard?

1

2          MR. GARFIELD: Object to the form.

3

4    A     I don't know.

5    Q     So you don't know if someone was standing 50 feet

6          away from Mr. Martin's car could -- if they could

7          have heard it?

8

9          MR. GARFIELD: Same objection.

10

11   A     Could have.

12   Q     If they were standing ten feet away, you don't know

13         if they could have heard it?

14   A     Again, I don't know.

15   Q     And we're just going back to what you've actually

16         stated.  We sat here for 50 seconds, right?

17   A     Uh-huh.

18   Q     And you talked about a loud thumping basing sound

19         that was gradually increasing as it was approaching

20         you.

21   A     Yes.

22   Q     And you're nodding in agreement --

23   A     Correct.

24   Q     -- to what I represent your testimony was.

25   A     Yes, ma'am.

Deputy Benjamin P. Fields - 11/12/2009
Carlos and Tashiana Martin v. Leon Lott, et al.

104

 1    Q    But you can't tell me how far away you think

 2         someone could hear the loud music if they were

 3         standing ten feet away, whether or not they could

 4         hear it if they were standing ten feet away?

 5    A    **I mean, I can't say what somebody else would hear**

 6         **or wouldn't hear.  I don't know what else to say.**

 7    Q    A person with normal hearing like normal hearing

 8         just like you and I, could they have heard that

 9         music standing ten feet away from his vehicle?

10

11         MR. GARFIELD: Object to the form.

12

13    A    **I would think so, yeah.**

14    Q    All right.  Could they have had heard it if they

15         were standing 20 feet away?

16

17         MR. GARFIELD: Same objection.  Go ahead.

18

19    A    **Again, I would think so, yeah.**

20    Q    Thirty feet?

21

22         MR. GARFIELD: Same objection.

23

24    A    **I would think so.**

25    Q    Forty feet?

1

2          MR. GARFIELD: Same objection.

3

4    **A**    **It's possible.**

5    Q    Sitting in their car?

6    **A**    **Yes.**

7

8          MR. GARFIELD: Same objection.

9

10   **A**    **I mean, like I said, they all could have.**

11   Q    Could have.

12   **A**    **Could have, yeah.**

13   Q    But did they?

14   **A**    **I don't know.**

15

16         MR. GARFIELD: Same objection.

17

18   Q    Have you read any of the witness statements in this

19        case?

20   **A**    **Possibly.  I don't know.**

21   Q    Possibly?

22   **A**    **I mean, I think I have.  I mean, I read a lot of**

23        **different statements, I mean.**

24   Q    In any of the witness statements that you've read,

25        other than yours because I understand you heard

Deputy Benjamin P. Fields - 11/12/2009
Carlos and Tashiana Martin v. Leon Lott, et al.

106

1      loud thumping base sounds, did any of those witness

2      statements state that they heard loud music?

3  A   I don't know.

4  Q   Okay.

5  A   Do you have copies of it I could look at maybe?

6  Q   Well, I'm just asking on your personal knowledge.

7      And your personal knowledge is that you have read

8      these statements and you don't know if they stated

9      if they had heard --

10 A   Well, I think I recall one statement in particular.

11     I think that's it.  I don't remember reading any

12     other.

13 Q   All right.  So --

14 A   I mean, I've read a lot of statements, so I'm not

15     sure.

16 Q   Well, tell me about the one statement that you

17     recall.

18 A   I really don't remember it.

19 Q   But you read one statement that you don't recall,

20     but in all of your recollection, you don't recall

21     if any of those statements said that they heard

22     loud music at the time that this incident occurred?

23 A   I don't understand the question.

24 Q   You read all these statements, including yours,

25     right?

Deputy Benjamin P. Fields - 11/12/2009
Carlos and Tashiana Martin v. Leon Lott, et al.

107

1   A   **I may have read all those statements.  Like I said,**
2       **I don't know.**
3   Q   All right.  Maybe I'm just not asking the question.
4   A   **Maybe I'm just confused.  I don't know.**
5   Q   Did you read statements other than your statements?
6   A   **Yes.**
7   Q   When you read those statements that are other than
8       your statements, do you recall if any of those
9       statements those witnesses said that they heard
10      loud music at the time that this incident occurred?
11  A   **Okay.  You keep saying witnesses.  And I remember**
12      **there was one individual that I remember who gave a**
13      **statement.  And I don't remember what was in that**
14      **statement.  The only other statements I've read are**
15      **the two officers statements that responded to the**
16      **scene.**
17  Q   All right.  So you've only read the two officers
18      statements and another witness's statement?
19  A   **That would be correct.**
20  Q   All right.  And of that witness's statement, you
21      don't recall if that witness stated anything about
22      hearing or not hearing loud music?
23  A   **That would be correct.**
24  Q   All right.  That's all I wanted.  We're on the same
25      page, okay.

1           So, now you believe you've been taunted, if

2      that's correct, by Mr. Martin before this stop has

3      actually occurred?

4  **A**   **Possible.**

5  Q   It's possible or you felt like he had taunted you

6      before this stop actually occurred?.

7  **A**   **I mean, do I have that written somewhere?**

8  Q   Let's go to your IA report.  And maybe I'm

9      misinterpreting what you're saying.  Let's go to

10     page two of your IA report.

11

12     MR. GARFIELD: The Q&A, Erika, or the --

13     MS. HARRISON: The Q&A.

14

15 Q   The question reads, during our initial conversation

16     -- And I don't know who your conversation was with.

17     I presume it's with Officer White or Captain White.

18     "During our initial conversation in regard to this

19     incident on October 24, 2005, you stated Mr. Martin

20     had taunted you.  Please explain how he did that."

21     Your answer was, "Initially as he drove past me

22     bobbing his head up and down, looking straight in

23     my eyes and when I asked him for his ID and he

24     stated what the F for."  And I will represent to

25     you, you were actually saying an expletive.  But

1      I'm more genteel.  So --

2

3      MS. HARRISON: Is that an objection, Robby?

4      MR. GARFIELD: It's just a look.

5

6    Q  So prior to the stop, you had already believed that

7       Mr. Martin was taunting you.

8    A  **In my answer there, it looks like the combination**

9       **of all that looked like is what I mean when I say**

10      **he taunted me.  So a combination of him driving**

11      **past me as well as me making contact with him.  It**

12      **was a combination of those two things.  It wasn't**

13      **just him driving past me.**

14   Q  Okay.  Combination.  I'm with you here on

15      combination.  So combining two events.  You're

16      saying the first event was bobbing his head was not

17      -- bobbing his head, was that or was that not

18      taunting you?

19   A  **That was part of it.  Again, my question is very**

20      **clear.  Him taunting me was him driving past me**

21      **bobbing his head, okay, looking at me.  And when I**

22      **asked him for his ID, he stated what the F for.  So**

23      **it's very clear those two things is what I meant**

24      **when I say he taunted me.  And that's the way I can**

25      **answer it because that's what I have in the**

Deputy Benjamin P. Fields - 11/12/2009
Carlos and Tashiana Martin v. Leon Lott, et al.

110

1          question and answer here.

2     Q    Okay.  I'm following you.  I'm not misunderstanding

3          anything you're saying.

4     A    Okay.

5     Q    What my question, though, is this.  Is that prior

6          to him even saying what the F for, what I want to

7          know is did you consider him taunting you prior to

8          you stopping him?

9     A    Clearly my answer here, him bobbing his head and

10         looking at me, I consider that taunting.

11    Q    That's all.  And that bobbing of the head occurred

12         before the stop.

13    A    Right.  Because I had to flip my patrol car around.

14    Q    All right.  So at that time when he was bobbing his

15         head, he didn't know that you were going to stop

16         him for a noise ordinance violation?

17    A    I guess he didn't know.

18

19         MR. GARFIELD: May I, Erika, off this subject

20              without anything, I just wanted to, for

21              housekeeping and not to mess up your rhythm, I

22              think what Chris said earlier about stating

23              the grounds for an objection, I actually --

24              Chris is correct is on that, I think, under

25              the district rules.  If you do want to know

```
1              the grounds, I was thinking under state court
2              rules that I do not have to say.  I think
3              under district court rules, if I have to make
4              -- if I make an objection, it has to be the to
5              the form and state the basis if that's what
6              you want to know.
7                   The basis to my objection of the
8              question, How do you define taunting?  would
9              be that arguably calls for a legal conclusion,
10             and I can explain that or I could just kind of
11             leave that as is.
12   MS. HARRISON: We'll just leave that as is.  I just
13             wanted to know how he defined it personally.
14   MR. GARFIELD: Okay.  Very good.  I just wanted to -
15             - mea culpa.  We can move on.
16   MS. HARRISON: Thank you, Robby.
17   MR. GARFIELD: You're welcome.  Thank you.
18
19   Q   Do you need a break or anything like that?
20   A   No, I'm good.
21   Q   You're okay?
22   A   Yeah.  Thank you.
23   Q   All right.  Just making sure.  All right.
24             So you circle around, you're stopping the car,
25             Mr. Martin is getting out of his car because he's
```

Deputy Benjamin P. Fields - 11/12/2009
Carlos and Tashiana Martin v. Leon Lott, et al.

112

```
 1        actually parked in front of his apartment, right?

 2   A    At the time -- I mean, I didn't know that, but --

 3   Q    He's parked somewhere that --

 4   A    He's parked.  He's parked.

 5   Q    Right.  He's parked.

 6   A    That is correct.

 7   Q    And he's getting out of his car.  You see him

 8        getting out of his car?

 9   A    Yeah.

10   Q    And what is he wearing at the time?

11   A    A camouflage outfit.  Looks like he's in the

12        military.

13   Q    Looks like he's in the -- Well, did you think he

14        was hunting or . . .

15   A    I don't know.  I mean, I really didn't know at the

16        time.

17   Q    Okay.  So he had on something that looked like he

18        was in the military.

19   A    Looked like he was in the military.

20   Q    Okay.  Was there any insignias like American flags

21        or . . .

22   A    I don't remember.

23   Q    Was he wearing a hat?

24   A    I really don't remember.

25   Q    All right.  That's okay.  All right.  So he gets
```

Deputy Benjamin P. Fields - 11/12/2009
Carlos and Tashiana Martin v. Leon Lott, et al.

113

1     out the car.  He's walking towards a unit in that

2     apartment complex, and that was presumably might

3     have been his apartment.  What do you do?

4  A  **Get out of the car.  And he's walking very fast, so**

5     **to get his attention I said, "Sir, I need to see**

6     **some ID."  He responded, you know, "what the F**

7     **for?"**

8  Q  You said, "Sir, I need to see some ID"?

9  A  **Let me look here.  I asked him to see his ID is**

10    **what I asked him.**

11 Q  So you didn't approach him saying, "Excuse me, sir,

12    my name is Officer Fields.  I'm with the Richland

13    County Sheriff's Department"?

14 A  **I did not do that.**

15 Q  Are you trained to do that?

16 A  **Yes.**

17 Q  So you did not adhere to your training when you

18    approached Mr. Martin?

19 A  **Well, again, our training is there for us, but**

20    **sometimes we have to -- I had to get his attention**

21    **quickly.  And so in doing that, I didn't have time**

22    **to go, hey, I'm Deputy Fields.  He was walking very**

23    **fast away from the scene, and I needed to get his**

24    **attention quickly.  So I asked him for his ID.**

25 Q  You wanted to get his attention very quickly

1    because you wanted to do what?

2  A  **Write him a ticket for the county noise ordinance.**

3  Q  Let's talk about that writing the ticket for the

4    county noise ordinance.  Prior to this incident,

5    had you ever written a ticket for a county noise

6    ordinance?

7  A  **According to my internal affairs question and**

8    **answer, I had not written a ticket up to that point**

9    **for loud music.**

10  Q  So you had been with -- on the force for exactly

11    how long?  And I could go back to my notes and

12    figure it all out.

13  A  **Well, we -- No.  We -- I was a deputy on the street**

14    **for a couple months.**

15  Q  For a couple months.  And you were also with -- and

16    while you were also training with your FTO, right?

17  A  **Correct.**

18  Q  All right.  And in that time frame that you'd been

19    training with your FTO and you'd been by yourself,

20    you hadn't written any tickets for a noise

21    ordinance?

22  A  **According to my answer there, I had not.**

23  Q  All right.  So I'm going to ask you the obvious

24    question.  Why was this instance different?  Why

25    not just give him a warning.

Deputy Benjamin P. Fields - 11/12/2009
Carlos and Tashiana Martin v. Leon Lott, et al.

115

1    A    **Well, he was breaking a noise ordinance and I felt**

2         **like he needed a ticket.**

3    Q    Well, other people have broken the noise ordinance

4         and they didn't need tickets?

5

6         MR. GARFIELD: Object to the form.

7

8    A    **I guess it's officer's discretion.**

9    Q    How many people, in your recollection and to the

10        best of your knowledge, how many people had you

11        stopped prior to this for a noise ordinance

12        violation?

13   A    **I have no idea.**

14   Q    More than one?

15   A    **I have no idea?**

16   Q    More than ten?

17

18        MR. GARFIELD: Object to the form.

19

20   A    **No idea.  I have no clue at all.**

21   Q    It has to be more than one, right?

22

23        MR. GARFIELD: Object to the form.

24

25   Q    Or is this your first one?

Deputy Benjamin P. Fields - 11/12/2009
Carlos and Tashiana Martin v. Leon Lott, et al.

116

```
 1   A   I don't know.  What's the date on this?  2005,

 2       okay.  I just don't know.  I really don't know.

 3   Q   Okay.  You don't know how many people you've

 4       actually stopped prior to this incident, but you do

 5       know that you haven't written anybody a ticket for

 6       a noise ordinance violation prior to this incident.

 7   A   According to my question and answer internal

 8       affairs, that is correct, that's what I said.

 9   Q   To the best of your knowledge and to the best of

10       your recollection, what was different about this

11       incident?

12   A   Well, a lot of times when we -- officer discretion

13       when we stop people for speeding or different

14       traffic offenses, whether it's loud music and

15       things like that, we can write them a ticket

16       without, you know, hey, see your I, you know,

17       driver's license, registration, proof of insurance.

18       It's an officer's discretion issue.  And we do take

19       people's attitudes in consideration when doing it.

20       And that is a -- You know, we -- A lot of people

21       can dictate, you know, how that goes, what their

22       attitude is like.

23           And so, I think in this particular situation,

24       his attitude was very, very poor.

25   Q   Okay.
```

Deputy Benjamin P. Fields - 11/12/2009
Carlos and Tashiana Martin v. Leon Lott, et al.

117

1    A    **And to get his -- to clearly get his attention, I**
2         **said that to him that I was going to write him a**
3         **ticket to get his attention on this.**
4    Q    All right.  So I need to make sure I understand
5         exactly the sequence of your thought process before
6         I go further into this.
7    A    **Okay.**
8    Q    When you stopped him and got out of your car and
9         said, sir, let me see some ID, was it your intent
10        at that moment to write him a ticket?
11   A    **Yes, he broke -- he was breaking a county noise**
12        **ordinance.   That's correct.**
13   Q    I know he was breaking -- I know that part.  But
14        you're saying to me it's officer discretion.
15   A    **Uh-huh.**
16
17        MR. GARFIELD: Is that yes?
18
19   A    **Yes.**
20   Q    That's officer discretion whether or not you decide
21        to write someone a ticket or not write someone a
22        ticket?
23   A    **That's correct.**
24   Q    And you explained to me before you take into
25        consideration the attitude of someone.

Deputy Benjamin P. Fields - 11/12/2009
Carlos and Tashiana Martin v. Leon Lott, et al.

118

```
 1   A   Yes.

 2   Q   All right.  And it's my understanding that you felt

 3       as though when he passed you, he was taunting you,

 4       but you don't know if he was bobbing his head to

 5       the music or not.  But when he bobbed his head up

 6       and down and looked at you, you felt as though he

 7       was taunting you?

 8

 9       MR. GARFIELD: Object to the form.  Go ahead.

10

11   A   According to my internal affairs question and

12       answer, that would be part of what I thought him

13       taunting me was, yes.

14   Q   So was that the attitude which precipitated the

15       reason for why you had decided to write him a

16       ticket prior to him even making one actual

17       statement to you?

18   A   I was writing him a ticket because he broke a

19       county noise ordinance.  Period.  It's just that

20       simple.  I mean, we -- I take attitudes into

21       consideration and things like that.  It's a case to

22       case basis, though.  And so he was getting a ticket

23       for county noise ordinance, and that's the bottom

24       line.  And I made that decision when I got -- when

25       I turned my patrol car around to get out with him.
```

119

```
 1   Q   But also, as you've stated, it's discretionary.

 2   A   It is discretionary.

 3   Q   And you had never done that before?

 4

 5       MR. GARFIELD: Object to the form.  Asked and

 6           answered.

 7

 8   A   I'd never written a ticket for loud music before.

 9   Q   And there's nothing different about that event

10       versus all the other events that you have stopped

11       people for a noise ordinance?

12

13       MR. GARFIELD: Object to the form.

14

15   A   I don't know how to answer that.

16   Q   I'm asking you --

17   A   I mean, I'm a little bit confused, I guess.

18   Q   And maybe it's just the way I'm asking the

19       question.  I'm asking you what was so different?

20       What's so different about this event versus all the

21       other events that you had stopped people for?

22

23       MR. GARFIELD: I'm going to object to the form.  And

24           to correct my previous wrong, I'd be glad to

25           put my grounds down.  But I'm just going to
```

1           object to the form of this question.

2      MS. HARRISON: I know one of the objections might be

3           asked and answered, but I've asked him what

4           the difference is.  And I haven't -- And I

5           don't think he's been able to articulate that

6           difference.

7      MR. GARFIELD: Well, just because he doesn't

8           articulate it to your satisfaction doesn't

9           mean that he hasn't articulated it.  And I

10          think beyond this, with all due respect,

11          Erika, it's bordering on annoying and

12          harassing the witness because I think he's

13          tried to answer the question.  I don't want to

14          suggest the answer, but that's just what I'd

15          put on the record.  Go ahead and answer this

16          question.

17

18   **A     You're assuming that I made a million traffic stops**

19   **or something like that about noise ordinance before**

20   **I did this.  I don't remember how many -- I may not**

21   **even dealt with anybody with loud music before this**

22   **incident.  I don't know, okay.**

23          **Clearly, I said in here I always give a verbal**

24   **warning, I've never written a ticket since -- since**

25   **I've been on the road as a deputy.  I mean, and**

Deputy Benjamin P. Fields - 11/12/2009
Carlos and Tashiana Martin v. Leon Lott, et al.

121

1      that's all I can go by is what I've said here.

2           You're asking me what's the difference in this

3      situation.  His music was simply extremely loud,

4      like I put in my report.  And, therefore, he was

5      going to get a ticket for it.

6   Q  All right.  I'll just move on.  So he -- So once

7      you approached him and you asked him for the ID,

8      and what type of ID does he present to you?

9   A  Let's see here.  Okay.  He gave me a military ID.

10  Q  All right.  Did he give you any other additional

11     ID?

12  A  Not that I have documented here.  And not that I

13     can remember.  He may have.

14  Q  I'm going to represent to you this is Exhibit No. 6

15     from Mr. Martin's deposition.  That is not the

16     actual ID, is that a similar ID?

17  A  It could be.  I really don't remember what the ID

18     looked like.  It looks like a military ID.

19  Q  And I'm going -- And this is Exhibit No. 7 from Mr.

20     Martin's deposition.  Does that look like the ID he

21     may have presented to you?

22  A  It could have been either one.  I really don't

23     remember.  But they're both military ID's, so.

24  Q  So after he presented the ID's to you, what then

25     occurred?

Deputy Benjamin P. Fields - 11/12/2009
Carlos and Tashiana Martin v. Leon Lott, et al.

122

1   A   Well, he was irate as he handed me the ID's. He

2          was steady cursing, things like that, causing a

3          scene in the parking lot. At that point in time,

4          neighbors began to gather. I advised him to calm

5          down. This went on for some time. And, again, I

6          don't know the exact time frame on it, but it went

7          on. I told him to calm down again and again or I

8          was going to put him under arrest for breach of

9          peace. And he didn't calm down. So I went to

10         arrest him for breach of peace.

11   Q   All right. Let's go back. You understand what

12         breach of peace is.

13   A   Uh-huh.

14   Q   And you understand a person's First Amendment

15         right.

16   A   Right.

17   Q   All right. So the first thing was he said, and

18         this is according to you, he said "what the F for?"

19         Is that the first thing he stated to you when you

20         asked him for the ID?

21   A   According to my report, yes.

22   Q   At that point in time, had Mr. Martin breached the

23         peace?

24   A   No.

25   Q   All right. And then you stated to him, "Because

1      your music was entirely loud and I'm going to write

2      you a ticket for it."  And then you also further

3      state in your statement, "At that time, the subject

4      became very upset and started cursing and saying

5      things like this is bullshit, you're a racist ass

6      cop, what the F, no one ever complains about my

7      music being loud."  I'm going to stop right there.

8          At that point in time, is Mr. Martin breaching

9      the peace?

10

11     MR. GARFIELD: Object to the form.  Go ahead.

12

13  A  **I think he's still objecting to me.  But, again, if**

14     **he's using fighting words or if it's so loud and**

15     **boisterous that it's causing a disturbance within**

16     **the complex then he could be.  And that's why I**

17     **warned him to calm down several times while that**

18     **was going on.**

19  Q  He's solely objecting to you, right?

20  A  **I understand that.  But if it causes a scene or if**

21     **I feel like it might be fighting words, then he**

22     **could be breaching the peace.**

23  Q  He's allowed to object to you.  We've already

24     agreed to that, right?

25  A  **We have agreed on that.**

1  Q  Did he use any fighting words in here?

2  A  **You could --**

3

4  MR. GARFIELD: Object to the form. Go ahead.

5

6  A  **I mean, you could interpret them as fighting words**

7  **at the time. I could have. I mean, yeah, very**

8  **easily interpreted it as that.**

9  Q  So if I was to sit here and call you a racist ass

10  cop, are you -- would you arrest me for breach of

11  peace?

12  A  **No, I would not. Not based off you calling me**

13  **that, no.**

14  Q  All right. Are those fighting words to you?

15  A  **Depending on how they're said, where they're said,**

16  **how loudly they might say, if you're aggressive**

17  **toward me while you're saying them. I mean, all**

18  **that stuff I take into consideration. Not just --**

19  **Go ahead.**

20  Q  No. Go ahead. Finish your answer.

21  A  **Not just you're a racist ass cop or why the F for.**

22  **It's a lot more than just him saying those words.**

23  Q  So you don't think I'm aggressive?

24  A  **I don't think you're what?**

25  Q  You don't think I'm aggressive, do you?

Deputy Benjamin P. Fields - 11/12/2009
Carlos and Tashiana Martin v. Leon Lott, et al.

125

1  **A**  **No.**

2  Q  All right.  So when I say you're a racist ass cop,

3  that's not me being -- I'm not being aggressive

4  towards you?

5  **A**  **No, I don't feel that way.  That's your opinion.**

6  Q  All right.  Let's see.  If I said to you you're a

7  mother fucker, this is bullshit, am I being

8  aggressive with you?

9  **A**  **How you said it right there, no.**

10  Q  All right.  Am I breaching the peace if I'm saying

11  you're a mother fucker?

12  **A**  **Directed toward me, in this setting, no, you're**

13  **not.**

14  Q  If I was standing outside and you and I weren't in

15  this building, would this -- would that breach of

16  peace?

17  **A**  **If your mannerisms are different, if you're very**

18  **aggressive while you're doing it, if you're very**

19  **loud and you start causing a scene, and causing a**

20  **scene means people start getting drawn to the scene**

21  **to see what's going on, that's very possible you**

22  **could breach the peace, yes.  It's very possible.**

23  Q  So if I was -- If you had stopped me outside for

24  littering and you were trying to write me a --

25  well, I think it's a $200 ticket, I can't remember.

1       Whatever the fine is for it.  - And I said that's

2       bullshit, is that breach of peace?

3  **A**   **No, just that alone.  Just that alone?**

4

5       MS. HARRISON: Sorry.  Robby just -- Robby

6           distracted me.

7       MR. GARFIELD: My fault.  I apologize.

8

9  Q   All right.  I'm going to -- The question was, if I

10      was standing outside and I had placed -- and I had

11      littered in front of the parking lot and you tried

12      to ticket me for it and I said this is bullshit?

13  **A**   **Based on that right there, no, that's not breach of**

14      **peace.**

15  Q   All right.  And you hand me the ticket and I said

16      you're just a mother fucking racist cop, is that

17      breach of peace?

18  **A**   **No.**

19  Q   All right.  So I'm going back to your statement.

20      I'm going back to your statement.  And I think it

21      was the -- I think I was on the last quotation,

22      which is, "This is bullshit, you're a racist ass

23      cop, what the F, no one ever complains about my

24      music being loud."  At this time --

25

Deputy Benjamin P. Fields - 11/12/2009
Carlos and Tashiana Martin v. Leon Lott, et al.

127

1      MR. GARFIELD: I'm sorry, Erika, where are you

2            reading that from?  I'm just --

3      MR. FIELDS: From my IA statement, right?

4      MS. HARRISON: Right.

5      MR. GARFIELD: Because I don't want to ask him.

6            Okay.  I got you.  Thank you.

7

8  Q   At this time, is Mr. Martin breaching the peace?

9  A   **I have in my statement, "He continued to be curse**

10     **and be irate about the situation saying the same**

11     **things over and over again: you racist ass cop,**

12     **mother fucker, this is bullshit.  I advised Mr.**

13     **Martin several times to calm down; he did not.  The**

14     **crowd continued to gather and I told him to calm**

15     **down again."**

16          **It was just continuos him being loud, cursing.**

17     **He was, in general, creating a scene.  And some of**

18     **it was directed at me, some of it was just him**

19     **being loud and boisterous and cursing and carrying**

20     **on.**

21 Q   But his comments, though, were directed directly at

22     you, right?

23 A   **Some of his comments were, yes, and I have those**

24     **here.**

25 Q   Which comments were not directed at you?

Deputy Benjamin P. Fields - 11/12/2009
Carlos and Tashiana Martin v. Leon Lott, et al.

128

1    A    He was very loud.  He was cursing very loudly.

2         Some at me.  Just in general, he was cursing.  He

3         was told to calm down.  He created a scene and he

4         was arrested for breach of peace.

5    Q    I guess my question, though, was exactly what

6         comments were not directed at you?

7    A    I can't tell you that.  Some -- I mean, some of

8         these I have written down here were directed at me.

9         I mean, when he's saying this is -- you know, this

10        is bullshit, he could have been talking to somebody

11        who come on scene there.  I don't know.  I just

12        remember those things coming out of his mouth.

13   Q    Is he looking directly at you at the time?

14   A    No.  Not the whole time, he was not.

15   Q    Is he talking -- Who did he talk -- Did he converse

16        with someone and say isn't -- is -- Did he say --

17        He's standing across from you, right?  Like I am?

18        Are y'all about -- Y'all are a little closer?

19   A    No.  He's not standing -- He's not standing across

20        from me.

21   Q    Well, where are y'all?  Are you in front of the

22        truck, in front of the white Ford Explorer, in

23        front of the apartment?

24   A    I don't exactly remember.

25   Q    All right.  Well, you don't exactly remember where

1      you were, but how far apart were y'all when y'all

2      were having this dialogue?

3   **A**   **It could have been from me to you.**

4   Q    All right.  So we're about this far away.  Does he

5        look over to someone and say this is bullshit?

6   **A**   **I don't remember.**

7

8        MR. MILLS: Erika, you just may want -- The record's

9            not going to reflect --

10       MR. GARFIELD: Dimensions.

11       MR. MILLS: -- how far that it is.

12       MS. HARRISON: Oh, sorry.  Thank you.

13

14  Q    I think -- Well, I'm five feet tall, so we're --

15       this is probably about three feet.

16

17       MR. GARFIELD: I think we've done this before.  I

18           think it's like three and half to four feet.

19       MS. HARRISON: Three and a half.

20       MR. MILLS: Measured the table?

21       MR. GARFIELD: I think this is what -- This

22           subject's come up before.

23       MS. HARRISON: Yeah.  You've measured it before.

24

25  Q    All right.  So about three and a half feet.  So you

Deputy Benjamin P. Fields - 11/12/2009
Carlos and Tashiana Martin v. Leon Lott, et al.

130

1     and I are about three and a half feet apart and

2     y'all are having this dialogue.  It's loud.

3     according to you, it's loud.  Is he screaming at

4     you?

5  A  **He's yelling.  Screaming, yelling, same thing.**

6     **But, yeah, he's yelling.**

7  Q  Is he at the top of his lungs?

8  A  **I mean, I don't know what the top of his lungs are,**

9     **but he was very loud.  It was enough to cause a**

10    **scene where people were coming out of their**

11    **apartments.**

12 Q  Now, I asked you again does he look over to someone

13    in this crowd that's gathering and say --

14 A  **And I said I don't know.**

15 Q  You don't know?

16 A  **I don't know.**

17 Q  All right.  So you don't know -- What you don't

18    know is if any of his comments were directed to

19    other people, but you do know that the comments

20    that he was making towards -- but you do know

21    comments that he was making towards you?

22 A  **Here's what I know, is that he was very loud, he**

23    **was very boisterous, he was cursing, okay.  He**

24    **disagreed with what I was doing.  But in the midst**

25    **of all that, he was cursing very loudly causing a**

Deputy Benjamin P. Fields - 11/12/2009
Carlos and Tashiana Martin v. Leon Lott, et al.

131

1    scene disrupting that property.  And, therefore, he

2    was placed under of arrest for breach of peace.

3  Q   And as you and I sit here today, you didn't respond

4      in kind?

5

6      MR. GARFIELD: Object to the form.

7

8  Q   Well, in kind meaning did you reciprocate with

9      saying any profanity?

10  A   Negative, I did not.

11  Q   I'm sorry.  So, negative, you didn't respond with

12     profanity?

13  A   No, I did not.

14  Q   As we sit here today, even though the table is

15     about three feet, you and I are more like five feet

16     apart, right?

17  A   Okay.  Yeah.

18  Q   All right.  So we're about five feet apart.  And is

19     that about how far you were from Mr. Martin?

20  A   Approximately, as I remember it, yes.

21  Q   All right.

22

23     MS. HARRISON: That's all.  Let's break for lunch.

24

25         (A lunch break was taken at this time)

Deputy Benjamin P. Fields - 11/12/2009
Carlos and Tashiana Martin v. Leon Lott, et al.

132

1    Q    We were back in this area about regarding what was

2         said to you when you initially approached Mr.

3         Martin, right?  We had gone over that area,

4         correct?

5    A    I guess.  I don't remember.

6    Q    We've talked about the fact that you approached him

7         and said and your -- according to your statements,

8         say, sir, let me see your ID, right?  That's

9         something that you approached with him?

10   A    Yeah.  I approached him and said let me see your

11        ID.

12   Q    Now, of course, he responds -- Now, he did comply

13        and actually give you some ID, right?

14   A    Yes.

15   Q    All right.  So he gives you the ID.  So he's in

16        compliance with your request.

17   A    Yes.

18   Q    Now, at that point in time, did you say anything

19        about that specific ID?

20   A    As far as I can remember, I don't believe I did.

21   Q    So was it sufficient for you?

22   A    Not to write a uniform traffic ticket, no.  The

23        military ID would not be sufficient, not for me.

24   Q    Did you ask him for additional ID?

25   A    As far as I can remember, I did not.  Because at

Deputy Benjamin P. Fields - 11/12/2009
Carlos and Tashiana Martin v. Leon Lott, et al.

133

1      the time I was just trying to get him to calm down,

2      so I wasn't able to.

3   Q  And during this time while he's calling you a

4      racist, while he's saying all these other things,

5      you're just asking him please calm down?

6   A  Yeah.  I keep telling him calm down.

7   Q  So no other words are exchange by you other than

8      please, sir, calm down?

9   A  That'd be correct.

10  Q  All right.  Even though he's calling you a racist,

11     even though he's calling you an MF, even though

12     he's calling you all these names, you're at please,

13     sir, calm down?

14  A  According to my statement and my report, yes.

15  Q  All right.  Now, I asked you previously what words

16     were fighting words.  Were any of these words

17     fighting words to you directly?

18  A  As far as him saying "this is bullshit, you're a

19     racist ass cop," things of that nature, again, the

20     -- those words alone are not fighting words.  But

21     the aggression on top of a crowd gathering, okay,

22     on top of things he said very loudly could be

23     construed or interpreted as fighting words, yes.

24  Q  And excuse me, I might seem frustrated, but I'm

25     just trying to really just understand exactly what

Deputy Benjamin P. Fields - 11/12/2009
Carlos and Tashiana Martin v. Leon Lott, et al.

134

```
1        -- and I understand what your answer is.  You're
2        saying that this could be construed as.  What I'm
3        asking you, is it fighting words what he said to
4        you?
5
6        MR. GARFIELD: Object to the form.  Go ahead.
7
8    A   I interpreted the situation as him breaching the
9        peace.  To the best of my knowledge at the time and
10       through my reports and things of that, he was
11       breaching the peace.  As far as actual fighting
12       words, him engaging me wanting to fight me for
13       breach of peace, I don't recall that.  But as far
14       as him, you know, disturbing the peace, breaching
15       the peace, he did that.  And I felt like he did
16       that.
17   Q   Because a crowd came out and saw what was
18       happening?
19   A   Because of how loud he was.  Because of the words
20       he was using, how loudly he was using them and
21       because of the scene that he caused.
22   Q   But it had nothing to do with the crowd?
23   A   That's what I just said.  The scene, the crowd,
24       yeah.
25   Q   Okay.  Was the crowd doing anything to you?
```

Deputy Benjamin P. Fields - 11/12/2009
Carlos and Tashiana Martin v. Leon Lott, et al.

135

1   A   **Not that I was aware of, no.**

2   Q   All right.  A crowd is permitted to look --

3       onlookers are permitted to watch you do your job,

4       right?

5   A   **Yeah.**

6   Q   All right.  So if the crowd came out and all he was

7       doing was exchanging with you his ID and was

8       saying, yes sir, no sir, and a crowd still came

9       out, he wouldn't be in breach of peace, would he?

10

11      MR. GARFIELD: Object to the form.  Go ahead.

12

13  A   **And, again, in my experience, a crowd would not**

14      **have gathered had he been doing yes sir, no sir.**

15  Q   There are always gawkers or onlookers.

16  A   **Not always, no.**

17  Q   Well, we won't say always.  On occasion, are there

18      gawkers and onlookers to what -- when you make

19      stops?

20  A   **Depending where you're at, what part of the county**

21      **you may be in, there could be, but not always.**

22  Q   And when you do make a stop and there are onlookers

23      or gawkers, that person who you've stopped isn't in

24      breach of peace at that time?

25  A   **No.   There would be no reason that they'd be in**

Deputy Benjamin P. Fields - 11/12/2009
Carlos and Tashiana Martin v. Leon Lott, et al.

136

1          breach of peace.

2    Q     So a crowd gathering doesn't necessarily

3          precipitate a breach of peace arrest?

4    A     **No.  It was a totality of all the circumstances**

5          **involved with this situation.**

6    Q     All right.  And then that was your measuring stick

7          for breach of peace was the totality of the

8          circumstances?

9    A     **Yeah.  Not just the crowd gathering, but all the**

10         **other things I said as well.**

11   Q     The totality of the circumstances, meaning the

12         loudness, the profanity and the fact that a crowd

13         was gathering was the totality of the circumstances

14         for breach of peace?

15   A     **Absolutely.**

16   Q     All right.  Now, while you're describing the scene

17         in your statement, the first thing -- let's go to

18         the actual when you're ready to put him under

19         arrest.

20              How far away is he from you at that moment in

21         time when you're saying you're under arrest?

22   A     **I don't remember.**

23   Q     So he could have been less than a foot away or five

24         feet way?

25   A     **Well, I don't remember, so it could have been**

Deputy Benjamin P. Fields - 11/12/2009
Carlos and Tashiana Martin v. Leon Lott, et al.

137

```
1          either or.

2     Q    Okay.  So you don't know the distance.  All right.

3          So we'll agree you don't know the distance how far

4          you were away from him?

5     A    That's correct.

6     Q    Tell me exactly how you were able to put the

7          handcuff on his right arm.

8     A    Well, I approached him.  I told him he was under

9          arrest for breach of peace and I put the handcuff

10         on his right arm.

11    Q    All right.  Is he facing you or do you turn him

12         around?

13    A    I really don't remember.  I mean, clearly, he was

14         turned around.

15    Q    Okay.

16    A    Whether I turned him around or not, I don't

17         remember.  But clearly, he was turned around.  So I

18         got one cuff on and then that's when the fighting

19         again and the resisting began, after I got the cuff

20         on him.

21    Q    So he's -- So I just want to make sure I -- I mean,

22         I understood the all the things that you said.  But

23         he is turned around in order for you to put the

24         handcuff on his right arm?

25    A    That's right.  One handcuff was on and then that's
```

Deputy Benjamin P. Fields - 11/12/2009
Carlos and Tashiana Martin v. Leon Lott, et al.

138

1          when the fighting and resisting started.

2    Q    Did you ask him to turn around?

3    A    I don't remember, but, I mean, we typically do,

4          yeah.  I don't just grab hold of somebody when

5          they're under arrest.  They have an opportunity to

6          turn around, put their hands on -- behind their --

7          behind them.

8    Q    So Mr. Martin turned around or did you physically

9          turn him around?

10   A    I don't remember.

11   Q    But --

12   A    They have an opportunity to turn around.  I can

13         tell you that.

14   Q    Uh-huh.

15   A    Okay.  So he may have turned around himself.  I

16         don't remember.  But I just know I had a cuff on

17         him and the fighting and the resisting began.

18   Q    So you were able to -- He was still enough for you

19         to be able to put a right handcuff on him?

20   A    Still enough, I don't know.  We put handcuffs on

21         people that are moving around all the time.  So he

22         -- I don't remember.

23   Q    Well, if we don't use the word "still," was his

24         movement or his -- and I don't know a better word

25         to describe what he might have been doing at that

```
1          time that you were able to put the handcuff on him.
2          But it was -- He wasn't moving to the point that
3          you were unable to put a handcuff on him?
4    A     Clearly, because I got it on him.
5    Q     All right.  That's fair enough.  All right.  So is
6          he in compliance at that second that you're able to
7          put the handcuff on him?
8    A     I'm not sure.  I'm not sure if he was or not.
9          Again, I know this, once I got that handcuff on
10         him, that's when the resisting and fighting began.
11         So, in saying that, and in my report it says that,
12         my guess would be, yeah, maybe he was compliant to
13         one handcuff.  But the problem is you got to be
14         compliant to two.
15   Q     All right.  So he's got to be compliant to two.
16         Now, he has turned his back to you with -- and
17         you've got the one handcuff on him, right?
18   A     Correct.
19   Q     Now, you said the fight -- Well, he starts flailing
20         around or what does he start doing?
21   A     Let me look at my report here.  It states in my
22         report, "I told Mr. Martin he was under arrest for
23         breaching the peace and he did place his hands
24         behind his back.  He did turn around.  I placed one
25         handcuff on his right arm and then that's when the
```

Deputy Benjamin P. Fields - 11/12/2009
Carlos and Tashiana Martin v. Leon Lott, et al.

140

1    **fight incurred. He began to pull away from me and**

2    **began kicking and swinging his left arm around**

3    **striking me in the left leg and in the left arm."**

4    Q    All right. That last sentence that you read, you -

5         - it says, "I turned Mr. Martin around." So you

6         already have a hand on Mr. Martin at that

7         particular time when you have turned him around and

8         you've put the right -- you've put the cuff on his

9         right hand.

10        So am I to assume that you were actually the

11        person who turned him around?

12   A    **Where is that at? I'm sorry.**

13   Q    It's in that sentence that you read.

14   A    **I think we're reading from two different documents**

15        **here.**

16   Q    I'm reading from this document. I'm reading from

17        your actual statement.

18

19        MR. GARFIELD: Is this Exhibit No. 2 you're

20            referring to?

21        MS. HARRISON: Yeah.

22

23   Q    Okay. I'm sorry. I thought we were reading from

24        the same document.

25   A    **Okay. And where are you at in that?**

Deputy Benjamin P. Fields - 11/12/2009
Carlos and Tashiana Martin v. Leon Lott, et al.

141

1   Q   I'm at right before -- You see where you might have

2       put the central 263 10-83?

3   **A**   **Yeah.**

4   Q   I'm above that.

5   **A**   **Okay.**

6   Q   Okay what?

7   **A**   **What are you asking, I'm sorry?  What's the**

8       **question?**

9   Q   My question was, can I assume that you actually

10      physically turned Mr. Martin around based on this

11      sentence?

12   **A**   **Can you assume that I turned him around?  I don't**

13      **think from that sentence you can, no.**

14   Q   Well, it says "I turned Mr. Martin around."  So did

15      Mr. Martin turn around or did you turn him around?

16   **A**   **I think that sentence is pretty unclear.  I'm not**

17      **sure.  And, like I said before, I'm just not sure**

18      **whether he turned around.**

19   Q   Okay.  So --

20   **A**   **I mean, it might -- it may be clear to you.  I'm**

21      **just, I'm not real clear about it.**

22   Q   This is your statement you wrote, right?

23   **A**   **Correct.**

24   Q   And you reviewed this statement, right, before you

25      signed off on this statement?

Deputy Benjamin P. Fields - 11/12/2009
Carlos and Tashiana Martin v. Leon Lott, et al.

142

1  A    That's correct.

2  Q    So what you're telling me is that this sentence is

3       not clear -- it's not clear to me or rather the

4       sentence is not clear to you if that is actually

5       correct or not about whether or not you turned Mr.

6       Martin around.

7  A    Well, I turned him around.  We can turn people

8       around and say, hey, turn around and put your hands

9       behind your back verbally.  They may turn around.

10      We may, sometimes, have to physically turn them

11      around.  It doesn't actually say I physically

12      turned him around, so I really -- he might have

13      turned around when I asked him to turn around.  The

14      point was I got him to turn around.

15  Q   All right.  So Mr. Martin turned around, but you

16      don't know if you physically turned him around or

17      if he just complied and turned around?

18

19      MR. GARFIELD: Objection.  Asked and answered.

20

21  A    According to my police report, the actual report,

22       is he turned around on his own.

23  Q    All right.

24  A    And it's a lot more clear in there in the police

25       report.

1    Q    The police report is more clear than?

2    **A**    **Than the Internal Affairs statement.  In other**

3         **words, my police report it clearly says he turned**

4         **around.  He turned around himself.  "C. Martin**

5         **turned around and RO placed on cuff -- and I placed**

6         **one cuff on him on his right arm.  And then Mr.**

7         **Martin tried to pull away.  That's when the**

8         **resisting began."  In here it's just a little**

9         **unclear about how he turned around.  Did I**

10        **physically turn him around, did I verbally tell him**

11        **to turn around.  He did turn around, and so it's**

12        **more clear in my police report.**

13   Q    All right.  So physically turned around.  All

14        right.  Good.

15   **A**    **No, no, no.**

16   Q    No.  I mean, I'm sorry, he turned -- Mr. Martin

17        turned around.

18   **A**    **Correct.  He turned around when he was told he was**

19        **under arrest.  That's correct.**

20   Q    Now, at that juncture, you've got the right arm --

21        you've got the cuff on his right hand and you say -

22        - his back is to you?

23   **A**    **That would be correct.**

24   Q    And his left arm is free.  So you're basically --

25        your left side and his left side are facing --

Deputy Benjamin P. Fields - 11/12/2009
Carlos and Tashiana Martin v. Leon Lott, et al.

144

1      well, not facing each other, but -- His back is to

2      you and you're facing his back?

3

4      MR. GARFIELD: Object to the form.

5

6   A  **He's turned around. I have one cuff on him. As**

7      **far as our body placement, I can't be sure where my**

8      **body was at to his body. But his left arm was**

9      **free. I do know that.**

10  Q  And he started to fight and fling his left arm.

11     Well, tell me, is there something distinguishing

12     between the fight and flinging or is he just

13     flinging his left arm?

14  A  **So you're asking if there's a difference between**

15     **flinging and what? And fighting?**

16  Q  Well, I'm just trying to figure out, I mean, you

17     say you fighting and flinging. He's got the -- I'm

18     trying to visualize this. So I'm trying to get you

19     to tell me exactly how this scenario occurred. So

20     you've got the right -- you've got the cuff on him.

21     His hand is behind his back and his left arm is

22     free. So what is he doing with his left arm?

23  A  **At that point in time, he begins to pull away from**

24     **to resist and start swinging his arm around.**

25  Q  All right. So he's pulled away from you. So how

Deputy Benjamin P. Fields - 11/12/2009
Carlos and Tashiana Martin v. Leon Lott, et al.

145

1       far away has he pulled --

2   A   **Well, no, I have him still.  I mean, I have him.**

3       **He never was out of my custody.  I had my hands on**

4       **him the whole time.**

5   Q   All right.  So you weren't -- He didn't pull away

6       and you weren't chasing him?

7   A   **No, nothing like that.**

8   Q   All right.  So you've got him -- He's not under

9       control the way you want him under control, but

10      you've got a hand on him?

11  A   **I got a handcuff on his right hand.**

12  Q   All right.  So does he hit you at all with his left

13      arm?

14  A   **Yes.**

15  Q   Where does he hit you with his left arm?

16  A   **He hits me in the left arm and he kicks me in my**

17      **left leg.**

18  Q   So his left arm hits you in the left arm?

19  A   **There you go.**

20  Q   So his back is still to you and he's -- and I'm

21      swinging my arm to the left and he's just kind of

22      swinging back.  Is that what he's doing?  Is he

23      swinging back with left arm?

24

25      MR. GARFIELD: Object to the form.

1

2  A  Possibly.  I mean, I know, according to my report

3     again, he did strike me.  I mean, the way you're

4     imitating it as is he struck me several times.  He

5     struck me one time with his left arm.

6  Q  Struck you once.  Oh, okay.

7  A  And then he kicked me with his leg.

8  Q  How many times did he kick you?

9  A  And it's clear in the report, again, that that

10    happened one time.

11 Q  So one strike to the left arm and one strike to the

12    left leg?

13 A  Correct.

14 Q  All right.  And then you then -- And you have him

15    underneath control that you're able to reach for

16    your radio?  Is it the -- Do you reach for your

17    radio or is it attached to your --

18 A  It would be attached up here.

19 Q  Attached to your chest area?

20 A  Yeah.

21 Q  Well, I mean, --

22 A  Right in here.

23 Q  Well, what's right in here?  Is that --

24 A  Okay.  That's my chest area.

25 Q  Chest area.

| | | |
|---|---|---|
| 1 | A | Middle of the chest. |
| 2 | Q | All right. So you're taking your left arm and you |
| 3 | | are calling for a 10-83? |
| 4 | A | I could have took my right or left arm. I don't |
| 5 | | know. But he's continuing to pull -- push away |
| 6 | | from me, trying to get away from me in a defensive |
| 7 | | way. And I called for backup. That's correct. |
| 8 | Q | And when do you actually take him to the ground? |
| 9 | A | Sometime after that I took him down to the ground. |
| 10 | Q | Is it seconds or minutes? |
| 11 | A | Oh, no. I mean, this happened with -- I mean, as |
| 12 | | far as the confrontation, it happens within a |
| 13 | | matter of seconds, as far as that goes. As far as |
| 14 | | backup getting there, it took a little bit. |
| 15 | Q | So you take him to the ground, he's on the ground, |
| 16 | | tell me what else, what next happens. |
| 17 | A | At that point in time, -- so you want to know what |
| 18 | | happens after he's on the ground? |
| 19 | Q | Uh-huh. |
| 20 | A | Okay. After I have him on the ground, his left |
| 21 | | hand is underneath his body. I am on top of him. |
| 22 | | And his wife comes running out and she -- and he |
| 23 | | tells her to videotape me beating him up and |
| 24 | | hurting him and stuff like that. And she has her |
| 25 | | cell phone where she begins to take pictures at |

Deputy Benjamin P. Fields - 11/12/2009
Carlos and Tashiana Martin v. Leon Lott, et al.

148

1           that point in time.

2    Q     You're on top of him.  How are you on top of him?

3    A     I believe I have a knee in his back.  I believe it

4           would be my left knee was on top of him.

5    Q     Have you done any knee strikes at this point?

6    A     Not at this point in time, no.

7    Q     So what have you done in order to secure Mr.

8           Martin?

9    A     At this point in time, I'm telling her to get back,

10          as I recall and remember it.  And I'm continuing to

11          tell him to give me his left hand.  He won't.  I

12          take out my capsicum, which is like mace is a

13          better way to understand what that is, and I try to

14          spray him with it, and that was ineffective.  I

15          sprayed him on the back of the head with it.  And

16          then I give two knee strikes to his right side.

17          And he still did not give his left hand up at that

18          point in time.

19   Q     You said something about you were trying to tell

20          Ms. Martin --

21   A     I told her she needed to get back from the

22          situation.

23   Q     As soon as she came out?

24   A     Right.

25   Q     To the scene?

Deputy Benjamin P. Fields - 11/12/2009
Carlos and Tashiana Martin v. Leon Lott, et al.

149

1  A  Right.  She just needed to back up.  That's right.

2  Q  So you're on top of Mr. Martin with your left knee.

3     Ms. Martin comes out?

4  A  Correct.

5  Q  In between your left knee being on Mr. Martin's

6     back and Ms. Martin coming out, he's calling for

7     his wife?

8  A  Yeah, I believe so.  I believe that's what was

9     going on.

10  Q  So he's asking for her to come out there to see

11     what's going -- to help him?

12  A  Yes.  He's asking her to come out there to

13     videotape and take pictures of me beating him up.

14  Q  And then you're asking for his hand?

15  A  Right.  His left hand is still underneath his body

16     at that point in time.

17  Q  And you pull out the mace or capsicum?

18  A  Yeah, capsicum.

19  Q  How many bursts of capsicum do you give him?

20  A  I would have to refer, probably, to my use of

21     force.  But I think one or two bursts is what I

22     tried to give him, as I remember it.

23  Q  Is that in -- In the three statements that you have

24     in front of you, is that anywhere indicated?

25  A  I'm not sure.  I know it says I used it.  I don't

Deputy Benjamin P. Fields - 11/12/2009
Carlos and Tashiana Martin v. Leon Lott, et al.

150

1     **think it says how many bursts. I believe one or**

2     **two times, though, as I remember it, I tried to**

3     **spray him.**

4   Q   And you sprayed directly at the back of his head?

5   A   **Yeah. I couldn't -- It's made to spray into the**

6     **eyes, but I just wasn't able to do that.**

7   Q   You weren't able to reach his face --

8   A   **His face was -- Yeah. He turned his head away, so**

9     **it was totally ineffective.**

10   Q   Now, that's ineffective. Your request -- he's not

11     -- he hasn't given up his left hand?

12   A   **Right. The whole time I'm requesting, you know,**

13     **give me your left hand.**

14   Q   And then what next do you do?

15   A   **And then I give two knee strikes to his right side.**

16   Q   And what does he do?

17   A   **And that was ineffective as well.**

18   Q   Anything else that you do as a maneuver to assist

19     you in trying to get the left hand?

20   A   **No, not at that point in time. I just sat. I**

21     **stood by and waited on backup to get there.**

22   Q   How many times did you call for backup?

23   A   **I only called once, I believe.**

24   Q   So at no point in time did you get back on your

25     radio while you were on top of Mr. Martin?

Deputy Benjamin P. Fields - 11/12/2009
Carlos and Tashiana Martin v. Leon Lott, et al.

151

1    A    I may have when I was top of him.  I may have, you

2         know, maybe said -- you know, where you guys at,

3         something like that.  But . . .

4    Q    Didn't you ask for a taser gun?

5    A    Yeah.  But that was originally when he was

6         resisting, the first time I got on the radio.

7    Q    So the first time you got on the radio -- Now, you

8         were on the radio while he was standing up, right?

9    A    That's correct.

10   Q    And then you were on the radio while you had --

11   A    That part I don't know.

12

13        MR. GARFIELD: Hold on.  Please allow her to finish

14            her questions first before you go ahead and

15            answer it.  Okay.  Thank you.

16

17   Q    You got on the radio again while your knee was in

18        his back?

19   A    I don't think so.

20   Q    You don't think so.  But then previously you said

21        you may have.

22   A    I may have.  But I don't think I did.  I don't

23        remember it.

24   Q    All right.  So you just don't remember if you did

25        or did not?

Deputy Benjamin P. Fields - 11/12/2009
Carlos and Tashiana Martin v. Leon Lott, et al.

152

1  A    Correct.

2  Q    All right.  So you don't remember getting back on

3       the radio at any point in time.  Now, how long are

4       you on top of Mr. Martin?

5  A    According to my report --  I don't recall.  It was

6       a couple of minutes, though.  I mean, it could be

7       two to five minutes.  Three to five minutes,

8       something like that.

9  Q    At any point in time, is Mr. Martin saying "You

10      can't do this to me, I'm an American soldier"?

11 A    I don't remember.

12 Q    You don't remember that at all?

13 A    No.

14 Q    All right.  Do you --

15 A    I mean, it's possible, but like I said, I don't

16      know.

17 Q    It's possible?

18 A    Uh-huh.

19 Q    Oh, well, wait a second.  Let's go to your

20      statement.

21 A    Okay.

22 Q    Your statement right here.  Isn't --

23 A    Okay.

24 Q    So that is something that you recall him saying?

25 A    Yeah.  Yeah.  That's correct.

Deputy Benjamin P. Fields - 11/12/2009
Carlos and Tashiana Martin v. Leon Lott, et al.

153

```
 1   Q    Do you recall at any point in time saying "You're
 2        just another black statistic"?
 3   A    No, ma'am.
 4   Q    "Another notch on my belt"?
 5   A    No, ma'am.
 6   Q    Do you ever recall using the word "statistic" all
 7        during this encounter with Mr. Martin?
 8   A    Okay.  What I said is basically in the midst of
 9        after he was arrested and after the handcuffs were
10        on him, I told him he was just another stat,
11        basically he's nothing special.  You know, he's
12        another person going to jail.  And just another
13        person.  I'm doing my job.  Have a good day.
14   Q    Have a good day.
15   A    Yeah.  I mean, that's kind of the way is, hey, he's
16        nothing special in this situation.  He's another
17        person who broke the law.  He's somebody else who's
18        going to jail and that's the way it is.
19   Q    All right.  I think -- I mean, I understand what
20        you're saying.  I understand that there's a
21        meaning, a connotation behind what you're saying,
22        but my question, though, to you is this.  Did you
23        specifically tell him you're just another stat?
24   A    According to my question and answer with internal
25        affairs, I did tell him that, yes.
```

Deputy Benjamin P. Fields - 11/12/2009
Carlos and Tashiana Martin v. Leon Lott, et al.

154

 1   Q   But you didn't give him an explanation of this

 2       meaning of, you know, you're just another person

 3       going to jail, you're just another -- you're

 4       nothing special?

 5   A   **No.  I don't have to.  So, no, I did not.**

 6   Q   All right.  So you just leave it at you're just

 7       another stat to him?

 8   A   **Probably so.**

 9   Q   Now, going to back to my initial -- you know,

10       there's some other comments that we talked about

11       earlier.  Talked about the Johnnie Cochran comment.

12       We talked about the fact that you said, you know,

13       about his career.  Is it professional to tell

14       someone that they're just another stat?

15   A   **Professional?**

16   Q   Uh-huh.

17   A   **In what way?**

18   Q   Is it professional as a Richland County Sheriff's

19       deputy to tell a person that's under arrest you're

20       just another stat?

21   A   **Is it professional to ask somebody if they're**

22       **another stat, that's your question?**

23   Q   No, I didn't say ask them if they're --

24   A   **I mean, is it professional to tell somebody they're**

25       **another stat.  Probably I would choose my wording**

Deputy Benjamin P. Fields - 11/12/2009
Carlos and Tashiana Martin v. Leon Lott, et al.

155

1    differently, okay.  Probably not the best way to

2    say that, no.

3  Q  Okay.  So once -- You said it took a little while

4    for backup to get there?

5  A  Yeah.

6  Q  And how many officers appeared on the scene at that

7    time?

8  A  Well, originally two.

9  Q  And that would be Deputy Clarke and Deputy Smith?

10  A  Correct.

11  Q  And then at the conclusion of the arrest, how many

12    officers --

13  A  We might have had eight to ten.  I don't know.  And

14    I'm speculating there.

15  Q  Eight to ten.

16  A  I'm speculating, yeah.

17  Q  And then had the crowd dissipated at the time that

18    all these officers had arrived?

19  A  I don't remember.

20  Q  Now, as your -- After the arrest is all completed

21    and done, after you -- Mr. Martin's been arrested,

22    handcuffed, taken over to the cruiser, your job

23    then is to do what?  To gather information?

24  A  Do the paperwork.

25  Q  To do the paperwork.

Deputy Benjamin P. Fields - 11/12/2009
Carlos and Tashiana Martin v. Leon Lott, et al.

156

1    A    Uh-huh.

2    Q    Do you go and ask for witnesses?

3    A    I think other officers did that.  I did not do

4         that.

5    Q    Your paperwork solely involved what, exactly?

6    A    It would be an incident report, arrest report,

7         warrant worksheet, a use of force form, an evidence

8         form.  I mean, all those things.

9    Q    And you do that all at the scene?

10   A    We do it all -- I mean, we would do it before the

11        shift is over.  And not necessarily on the scene

12        there, no.  But, I mean, we try to knock out the

13        arrest report.  Warrant worksheets, arrest report,

14        incident report usually knocked out on the scene,

15        yes.

16   Q    Okay.  And I think you just named off three

17        documents to me.

18   A    Use of force.

19   Q    Use of force.

20   A    That would usually be probably turned in the next

21        day with the incident report.  And then the

22        evidence form would be turned in, obviously, when

23        you do evidence.

24   Q    I think -- There are a lot of forms.

25   A    Okay.

1   Q   So which ones do you actually do at the scene?

2   **A**   **Okay. You can do all of them at the scene.**

3   Q   Agreed.

4   **A**   **And which ones I did that day I don't really**

5       **remember, okay. But I know the two that definitely**

6       **had to be -- the three that had to be done there**

7       **was the arrest report so he could go to jail and**

8       **the warrant worksheet. Those are the two things**

9       **you need for jail. Okay. And then the incident**

10      **report.**

11   Q   All right. Those three items were done at the

12      scene. How long do you think it took you to

13      complete those items?

14   **A**   **Let me back up for a minute. The incident report**

15      **was probably done -- It was done that day. I don't**

16      **know if it was done actually on the scene. Let me**

17      **clarify a couple things here. Two things were done**

18      **on the scene because they have booked in jail.**

19      **Okay. Usually we'll leave the scene to knock out**

20      **maybe an incident report, maybe drive up the road**

21      **or something like that.**

22      **So, I mean, as far as things getting done that**

23      **day, I know for a fact those three were done that**

24      **day.**

25   Q   How long were y'all out at the scene after this

158

```
 1        arrest?
 2   A    Well, I mean, as far as -- I mean, I guess there
 3        was a situation with the phone.  There was officers
 4        talking to witnesses getting some statements,
 5        things of that nature.  I don't know. I mean, I
 6        could speculate, but I'm not even going to try to
 7        speculate.  I really don't know.  Could have been a
 8        half hour, could have been an hour.  I don't know.
 9   Q    Let's think it might be on the longer side of over
10        an hour.
11   A    Okay.
12   Q    What things would you have been -- Because that's
13        an hour length of time, I mean, that's -- An hour's
14        60 minutes, so, you know, we've been in deposition
15        for, you know, a couple hours now talking back and
16        forth.  So in an hour's length of time, what do you
17        -- what could you have accomplished in hour lengths
18        of time at the scene?
19
20        MR. GARFIELD: Object to the form.  Go ahead.
21
22   A    Well, it just depends.  I mean, we have a three
23        page incident report, we have two or three warrant
24        worksheets, traffic ticket, two arrest reports.
25        So, I mean, that's possible.
```

Deputy Benjamin P. Fields - 11/12/2009
Carlos and Tashiana Martin v. Leon Lott, et al.

159

```
 1   Q   Are you talking to some of the other officers about
 2       exactly what happened?
 3   A   Yes.  I would talk to my supervisors about what
 4       happened.  That's correct.
 5   Q   Are you getting some guidance as to what to charge
 6       them with?
 7   A   No.  In this situation here, just some -- maybe
 8       some guidance of, you know, how best to maybe write
 9       the report.  You know, if you write a report and
10       they may give it back to you, something like that
11       because you -- just different things in the report.
12       Maybe different advice as far as like, for example,
13       taking the phone into evidence that day.  Things
14       like that.  That was a supervisor's call.  Just
15       stuff like that.
16   Q   Did anyone give you any guidance on how to write
17       your incident report?
18   A   How to write it?
19   Q   Uh-huh.
20   A   No, not how to write it.  We always get guidance as
21       far as, you know, what order to put stuff in and
22       things like that.  It's always a good teaching tool
23       for supervisors for newer officers and things like
24       that.
25   Q   So were you getting any guidance as to what order
```

```
 1        to put into your order -- what order of events you
 2        should put in this incident report?
 3   A    I don't remember that.  I know that when it comes
 4        to writing reports, I mean, that's something you
 5        always want to seek out.  What's the best way to --
 6        Maybe the best way to put it is maybe what words to
 7        use correctly.  Things of that nature.  But as far
 8        as what happened, what happened is what happened
 9        and you sometimes you get help on how to put that
10        on paper.  That's the best way I can put it.
11   Q    Let's look at your incident report then.
12   A    All right.
13   Q    You utilized the word "loud and boisterous" in your
14        incident report, do you not?
15   A    I could.  Where's it at?
16
17        MR. GARFIELD: Referencing a certain place?
18        MS. HARRISON: I just found it.
19
20   Q    Is this page two?  How do I --
21   A    Yeah.  That's page two.  That's page two what
22        you're looking at right there.
23   Q    At that time C. Martin, and that's Carlos Martin,
24        continues to be loud and boisterous towards RO
25        cursing and calling RO racist.  That's what --
```

Deputy Benjamin P. Fields - 11/12/2009
Carlos and Tashiana Martin v. Leon Lott, et al.

161

1    something you wrote in there.

2  **A**   **Uh-huh.**

3  Q   All right.  Loud and boisterous, are you utilizing

4      those words based upon any terminology that you've

5      been taught or are you using those words because

6      those are just words that you decided were

7      appropriate words to use in this report?

8  **A**   **Well, they are appropriate words to use in this**

9      **report, okay.  But anytime in our training and**

10     **things like that, there are certain things we look**

11     **for.  And there are going to be certain words where**

12     **we may put on paper that we are trained, okay,**

13     **whether through the academy or through our FTO and**

14     **things of that nature that are the correct words**

15     **that -- Best thing I can say is correct words to be**

16     **used.**

17  Q   So the correct words here would be "loud and

18      boisterous"?

19  **A**   **Well, that's what he was, he was loud and**

20     **boisterous.  So it fits what -- It fits what took**

21     **place out there.**

22  Q   So loud and boisterous are the terms --

23      terminologies that you've been taught as opposed to

24      terminology that you would have just utilized in

25      your everyday common language?

Deputy Benjamin P. Fields - 11/12/2009
Carlos and Tashiana Martin v. Leon Lott, et al.

162

```
 1   A    I don't think boisterous is something I go around

 2        saying, you know, went around saying before.  But

 3        it's something that, again, it's words that --

 4        Again, it's what he was being on the scene out

 5        there is the best I can tell you, you know.

 6   Q    So as you've been taught what loud and boisterous

 7        is in your training through the Criminal Justice

 8        Academy, through your field training officer, what

 9        does loud and boisterous not mean to you but what

10        has it meant to you in your training?

11   A    I mean, loud and boisterous can mean someone is

12        disorderly.  I mean, as far as this situation goes.

13   Q    So is that disorderly based upon the ordinance

14        disorderly or just disorderly in a general term of

15        reference?

16   A    He was loud and boisterous with his voice, things

17        of that nature.  And that's what that means in that

18        context.

19   Q    So with --

20   A    When I say loud and boisterous in this context, I'm

21        referring to his actions and the way he was acting

22        that day.

23   Q    But those words are based on your training, though,

24        not just your normal everyday use of the language?

25        Well, that's and that's a really --
```

1

2          MR. GARFIELD: Object.  Asked and answered.

3

4    Q     -- bad question.  The loud and boisterous are the

5          terms that you've been taught to use, not terms

6          that you would have just generally used in just an

7          everyday drafting your report?

8

9          MR. GARFIELD: Objection.  Asked and answered.  Go

10             ahead.

11

12   A     The question just doesn't make sense.  I'm sorry.

13         It just doesn't.  I'm having a hard time

14         understanding it.  I mean, you're asking me -- We

15         get trained to do certain things.  Before I became

16         a cop, I wouldn't go out here and put handcuffs on

17         somebody for running a stop sign or having loud

18         music.  But in training, you learn how to do those

19         things.  When someone breaks the law, you learn

20         what the law says, what the law is.  In this case

21         right here, okay, we learn different terms that we

22         would use, okay, to put in a report or you learned

23         what a -- you know, what different elements are in

24         a crime and things of that nature.  So I wouldn't

25         have been writing this report if I wasn't a cop.

Deputy Benjamin P. Fields - 11/12/2009
Carlos and Tashiana Martin v. Leon Lott, et al.

164

1    So, yeah, we get trained different ways when we

2    become law enforcement officers and we go from

3    there.

4

5    MS. HARRISON: Hold on a second.  I think I -- Can I

6         just step out and can we take a break for two

7         seconds -- two minutes.

8

9              (Short Break)

10

11   Q   The only question I really have for you today,

12       though, is this.  In this whole incident on October

13       24, 2005, is there anything that you would have

14       done differently?

15   A   No, ma'am.  I'm pretty clear about that in my

16       internal affairs thing as well.

17   Q   Yeah.  You say in your internal affairs that "I

18       would have not done anything differently in this

19       situation and I had supervisors confirm that while

20       on the scene there."

21   A   Yes, ma'am.

22   Q   All right.

23   A   And I stand by that.

24   Q   All right.  So absolutely nothing you would do

25       differently?

Deputy Benjamin P. Fields - 11/12/2009
Carlos and Tashiana Martin v. Leon Lott, et al.

165

```
 1

 2         MR. GARFIELD: Object to the form.

 3         MS. HARRISON: You can answer that question.

 4         MR. GARFIELD: Sure.

 5

 6    A    I'll quickly say this.  The Johnnie Cochran

 7         statement was a stupid statement.  And we've talked

 8         about that already.  We covered it.  It was a

 9         pretty emotional scene out there, okay.  And we're

10         kind of back and forth.  But the bottom line is

11         that it was just kind of a foolish statement to

12         make.  And unprofessional.

13              But as far as the way everything else went

14         down, the arrest, everything like that, and it had

15         nothing to do with the arrest, yes, I would have

16         done everything just the same.

17    Q    All right.  When you say emotional, were you

18         emotional about this?

19    A    Well, as a deputy Sheriff or a cop when you go to a

20         scene where you are wrestling around with somebody,

21         it does get amped up a little bit.  And so as a

22         human being, you just got to, you know, -- But as

23         far as me being emotional, no, we were just -- it

24         was just -- it was an out of line statement and I

25         wouldn't make that statement again.
```

1  Q  Were you angry with Mr. Martin?

2  A  **No. I mean, it's not personal. Again, I don't --**

3  **you know, this is the reason this has come back up**

4  **again that's why I have trouble remembering some of**

5  **this stuff unless it's in a report. I mean, the**

6  **next day we're back on the job doing the same thing**

7  **again.**

8

9  MS. HARRISON: All right.

10

11  - - - - -

12  RE-DIRECT EXAMINATION

13  BY MR. MILLS:

14  Q  What time did you come on shift that day?

15  A  **It looks like this happened about 4:30 in the**

16  **afternoon. So that means I would have come on at**

17  **seven that morning.**

18  Q  So did you work twelve hour shifts?

19  A  **Yes, sir.**

20  Q  All right. So you were getting towards the end of

21  your shift, is that right?

22  A  **Yeah, that'd be correct. Seven to seven, yes, sir.**

23  Q  Do you remember anything else that happened that

24  day?

25  A  **I don't recall. No, sir.**

167

1    Q    You weren't taking any alcohol or drugs that day,

2         were you?

3    A    **No, sir.**

4    Q    Are you on any kind of medication?

5    A    **Right now?**

6    Q    I'm sorry.  Back on that day.

7    A    **Oh, I don't remember.  I don't see why I would have**

8         **been, no.**

9    Q    Yeah.  I mean, do you have any conditions that you

10        take medication on a regular basis?

11   A    **Oh, no, sir.**

12   Q    Do you currently take medication?

13   A    **No, sir.**

14   Q    All right.  As part of your employment with the

15        Sheriff's Department, do they drug test you?

16   A    **Yes, sir.**

17   Q    Is that a random thing or just when you originally

18        come into employment?

19   A    **Random drug test.**

20   Q    Okay.  Do you know what they test for?

21   A    **I think -- Again, I don't want to speculate too**

22        **much, but I think it's like marijuana, cocaine.  I**

23        **don't -- I really don't know everything that that's**

24        **tested for.**

25   Q    Sure.

Deputy Benjamin P. Fields - 11/12/2009
Carlos and Tashiana Martin v. Leon Lott, et al.

168

1    A    I know it's a urine test.

2    Q    Do you know if they test for steroids?

3    A    I'm not sure if they do or not?

4    Q    Okay.  In your body building activities, have you

5         been aware of people taking steroids in that sport?

6    A    It's actually power lifting --

7    Q    Excuse me, I apologize.

8    A    No, it's okay.  Not that I'm aware of, no.

9    Q    So you're not aware of in the power lifting sport

10        people have been taking steroids?  I mean, that's

11        news to you?

12   A    No.  I'm sure people do -- I mean, I'm sure people

13        do.  As far as where I'm, you know, the people I

14        work out, I'm not aware of anybody that does.

15   Q    Okay.  And you don't take steroids?

16   A    No, sir.

17   Q    All right.  Have you ever been tested for steroids?

18   A    I don't believe so.

19   Q    Do you take any muscle building supplements at all?

20        I'm not talking about steroids.  I'm talking about

21        like Creatin or --

22   A    I've take Creatin before.  But at this point in

23        time, no, sir.

24   Q    And how about back in 2005 in October, the time of

25        this incident?

Deputy Benjamin P. Fields - 11/12/2009
Carlos and Tashiana Martin v. Leon Lott, et al.

169

1    A     I don't remember.  I really don't if I was taking

2          it at that point in time or not.  I mean, --

3    Q     I'm sorry.  I apologize.

4    A     No, go ahead.

5    Q     Did you ever, you know, go like to GNC or someplace

6          like that?

7    A     Yes, sir.

8    Q     Okay.  And that's essentially muscle building

9          supplements and things to that nature?

10   A     Yes, sir.

11

12         MR. MILLS: I think that's all I really want to

13               follow up with.  Thanks.

14

15                      (Short Break)

16                     - - - - -

17                    CROSS EXAMINATION

18   BY MR. GARFIELD:

19   Q     Deputy Fields, Ms. Harrison, I believe, asked you a

20         line of questions about the form or forms of

21         identification that Carlos Martin allegedly

22         provided to you on October 24, 2005.  Do you

23         remember that?

24   A     Yes, sir.

25   Q     Okay.  And I think she provided you Exhibit Nos. 6

Deputy Benjamin P. Fields - 11/12/2009
Carlos and Tashiana Martin v. Leon Lott, et al.

170

1      and 7 to Carlos Martin's deposition, two forms of

2      identification.  Do you remember that?

3  A   Yes.

4  Q   And she asked you pertaining to those two exhibits

5      is, were one or both of those, does that accurately

6      depict what Carlos Martin showed you on the scene

7      on this particular afternoon.  And I think you said

8      you weren't sure.

9  A   I wasn't sure which one, but possibly, yeah.  One

10     or the other.

11 Q   Okay.  Because he showed you a military ID,

12     correct?

13 A   Yes, sir.

14 Q   Okay.  I'm also going to show you a copy of what's

15     marked -- this is kind of a copy of something else,

16     but was Exhibit No. 8 to the plaintiff's, Carlos

17     Martin's, deposition.  And it shows front and back

18     of what purports to be some form of identification.

19     Do you see that in front of you?

20 A   Yes, sir.

21 Q   Okay.  Do you have a recollection one way or the

22     other as to whether Carlos Martin showed you what's

23     depicted in Exhibit No. 8?

24 A   I don't know either way.  I don't recall it.

25 Q   Had Carlos Martin showed you what's marked in

1       Exhibit No. 8 to you on the day in question, what,

2       if anything, would that represent to you as far as

3       what's -- what do you consider to be a valid

4       driver's license in South Carolina?

5

6       MS. HARRISON: Object to the form.

7       MR. GARFIELD: Go ahead and answer.

8

9   A   **Okay. It wouldn't be -- Obviously, it's not a**

10      **South Carolina driver's license. But as I look at**

11      **it here, it looks like it's given from the**

12      **military. Give me one second here. I mean, it's**

13      **not a valid South Carolina driver's license, no.**

14  Q   Does that look like a driver's license that you

15      were familiar with that was issued by any other

16      state?

17  A   **No, because there's no picture on it or anything**

18      **like that.**

19  Q   Do you see any typed information on there, personal

20      typed information?

21  A   **No. It just says military endorsement.**

22  Q   Do you see where it say the person's name and

23      number and things like that and date? Are any of

24      those typed or is that handwritten?

25  A   **All that's handwritten.**

1   Q   What, if anything, does that represent to you if

2        someone showed you something like that in Exhibit

3        No. 8?

4   A   **I mean, anybody could write that in. I mean, I**

5        **wouldn't take that as a driver's license. I'd**

6        **rather have a military ID than that just because at**

7        **least we have a form of picture -- a picture on**

8        **there. But this, I mean, --**

9   Q   You'd rather see a military ID other than this.

10       But did he show you anything that looked to you to

11       be a valid driver's license?

12   A   **No, he did not.**

13   Q   All right. Now, the question as far as you wanted

14       to talk to him about the loud music he was playing

15       in the car. I think you testified that the music

16       was extremely loud, is that true?

17   A   **Yes.**

18   Q   You testified and I think Ms. Harrison asked you

19       was it a thumping bass and a vibrating bass and you

20       said yes.

21   A   **Yes, I believe so.**

22   Q   Okay. And you recall that from October 24, 2005?

23   A   **That is correct.**

24   Q   Okay. Based on your qualifications and your

25       training and your experience as a law enforcement

1       officer in South Carolina, do you believe that the

2       actions of Carlos Martin in the car, okay, with the

3       thumping, vibrating bass and so on, was that breach

4       of the peace?

5

6       MS. HARRISON: Object to the form of the question.

7       MR. MILLS: Objection to the form of the question.

8

9    Q  Okay.  Do you believe that was a breach of the

10      peace?

11

12      MR. GARFIELD: And the objection's noted.

13

14   A  **I mean, the way he was playing his music, yes, that**

15      **was a breach of the peace.**

16

17      MR. GARFIELD: I don't have anything further.

18

19                      - - - - -

20             FURTHER DIRECT EXAMINATION

21   BY MR. MILLS:

22   Q  You indicated that the music was a breach of the

23      peace.  Is that what I just heard you say?

24   A  **I mean, it could be a breach of peace, yes, sir.**

25   Q  Okay.  Well, I think you just said it was a breach

Deputy Benjamin P. Fields - 11/12/2009
Carlos and Tashiana Martin v. Leon Lott, et al.

174

```
 1        of peace.
 2   A    Yes, it was.  I mean, --
 3   Q    Okay.  Did you tell Carlos Martin it was going to
 4        be -- that you were stopping him for breach of
 5        peace at that initial time based on that music?
 6   A    No, sir.  I said I was stopping him for a noise
 7        ordinance.
 8   Q    All right.  Were there any other people out in the
 9        parking lot at the time that you heard this noise?
10   A    I don't remember.
11   Q    Did anybody complain to you about the noise out
12        there at the time?
13   A    No, sir.
14   Q    Was there any indication that disrupted anything in
15        the public that you could see?
16   A    Oh, no, --
17   Q    Was anybody disturbed?  Was anybody complaining
18        that -- Was anybody out there to even hear that?
19   A    I had no complaints about it, and there was no
20        calls about it.
21   Q    Okay.  Did it tend to incite people to do violence
22        or to do something else?
23   A    I don't know.
24   Q    Did it incite people to disturb the community based
25        on this thumping noise?
```

1    **A**    **I really don't know.**

2    Q    Did you see it incite anybody?

3    **A**    **No.**

4    Q    And I'm sorry if I already asked you this.  Did you

5         see anybody in the parking lot other than Mr.

6         Martin?

7    **A**    **No, sir.**

8

9         MR. MILLS: Thank you.

10        MS. HARRISON: I don't have any further questions.

11        MR. GARFIELD: Nothing else.  I would like to put

12             one thing on the record just to ask fellow

13             counsel.  I think when we had a status

14             conference on the phone with Judge Anderson, I

15             think we -- I don't know if that was on the

16             record or not, but I think all of us

17             informally agreed at the very least that the

18             depositions, that the discovery depositions

19             that we're taking this week of Joseph Clarke

20             and Ben Fields would be the last discovery

21             depositions for them in this litigation,

22             including if this does go on to state court.

23        MR. MILLS: In other words, no, I'm not going to

24             notice him again.  If we remand to state

25             court, I'm not going -- would not notice him

Deputy Benjamin P. Fields - 11/12/2009
Carlos and Tashiana Martin v. Leon Lott, et al.

176

1           again for a deposition.

2       MS. HARRISON: Right.  I agree.  I mean, I think

3           that was our agreement.

4       MR. GARFIELD: Okay.  I just wanted to make sure I

5           understood that.

6       MS. HARRISON: I mean, that doesn't preclude us from

7           noticing other depositions.

8       MR. GARFIELD: Well, I'm talking about of Ben Fields

9           and Joseph Clarke.

10      MS. HARRISON: Right. That's what I'm --

11      MR. MILLS: And I think what we talked about,

12          though, is even though they were taken here

13          they could be used in that litigation the same

14          as if they were taken there.

15      MR. GARFIELD: Yes.

16      MR. MILLS: In other words, the rules of evidence,

17          like if we had taken them in state court, I

18          can publish that deposition as a defendant or

19          something like that.

20      MR. GARFIELD: Consistent with whatever rules --

21      MR. MILLS: Whatever rules --

22      MR. GARFIELD: Whatever rules of evidence.  Whatever

23          rules of court, yes.

24      MR. MILLS: Yeah.  I mean, I wouldn't heed the

25          argument since that was taken in the federal

```
 1              case, they can't introduce in this case.

 2    MR. GARFIELD: Absolutely.  And the same would go

 3         for Tashiana Martin, Carlos Martin from our

 4         side, too.

 5    MR. MILLS: Correct.

 6    MR. GARFIELD: Okay.  I just wanted to make sure.

 7

 8                    - - - - -

 9              (Whereupon, at 3:20 p.m., the deposition

10              in the above-entitled matter was

11              concluded.)

12

13

14

15

16

17

18

19

20

21

22

23

24

25
```

1          [Errata page to be attached]

2

3

4

5

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

Deputy Benjamin P. Fields - 11/12/2009
Carlos and Tashiana Martin v. Leon Lott, et al.

179

```
 1   State of South Carolina  )
                              )           CERTIFICATE
 2   County     of Lexington  )

 3           Be it known that the foregoing Deposition of
     DEPUTY JOSEPH A. CLARKE was taken by Jennifer L.
 4   Thompson, CVR;

 5           That I was then and there a notary public in
     and for the State of South Carolina-at-Large;
 6
             That by virtue thereof I was duly authorized
 7   to administer an oath;

 8           That the witness was by me first duly sworn to
     testify the truth, the whole truth, and nothing but the
 9   truth, concerning the matter in controversy aforesaid;

10           The foregoing transcript represents a true,
     accurate and complete transcription of the testimony so
11   given at the time and place aforesaid to the best of my
     skill and ability;
12
             That I am not related to nor an employee of
13   any of the parties hereto, nor a relative or employee of
     any attorney or counsel employed by the parties hereto,
14   nor interested in the outcome of this action.

15           Witness my hand and seal 26th DAY OF FEBRUARY,
     2010
16

17
                                            Jennifer L. Thompson, CVR
18

19   Notary Public for South Carolina
     My Commission Expires: 8/14/2014
20
         This transcript may contain quoted material.  Such
21         material is reproduced as read or quoted by the
                            speaker.
22

23

24

25
```

# RICHLAND COUNTY SHERIFF'S DEPARTMENT
## INTERNAL AFFAIRS

EXHIBIT #2
WIT: Fields
DATE: 11-12-09
Thompson Court Reporting Inc.

STATEMENT

State of South Carolina
County of Richland

Personally appeared before me this 2nd day of Nov. 2005 at 1:30 PM, an officer duly and legally authorized to administer oaths in the above named county and state aforesaid, comes one Benjamin Fields

Q: Why were you in Quail Run Apts.?
A: Dispatched to a call, suspicious person on property

Q: Did Mr. Martin pass you in the parking lot?
A: Yes

Q: Approximately how far did he travel past you before parking?
A: About 25 to 50 yards and than he parked

Q: Was his radio off at the time you approached him?
A: It was

Q: Did you have any complaints of loud music?
A: No

Q: Did you tell him you had complaints of loud music?
A: No sir

Q: As Mr. Martin passed you, did you observe anyone else in the area, on balconies, sidewalk?
A: No

Q: When you first approached Mr. Martin did you identify yourself and advise him why you wanted to talk with him?
A: No, not at first I asked him for his ID right away

Q: When you asked him for his ID did you tell him why you wanted his ID upon requesting it?
A: No

Q: Who was your FTO?
A: Larry Payne

Q: How were you trained to make verbal contact with individuals you make contact with?
A: Deputy Fields with the Richland County Sheriff's Dept., than I go into what ever it is I want to discuss with them

Q: Why not this time?
A: As fast as he was walking I wanted to get his attention

Q: Why did you elect to charge Mr. Martin in lieu of a warning of some kind, do you generally ticket everyone you hear playing loud music in his or her car?
A: I have never written a ticket since being on the road for loud music. I always give verbal warnings

Q: You stated on 10/24/05, you had control of Mr. Martin and he was not a real threat to you because you were much larger than him. Why were you calling on the radio for a taser?
A: A crowd was gathering, I was not sure who else may become hostile. His wife was real close to me and I did not know what she was going to do.

Q: During our initial conversation in regard to this incident on 10/24/05, you stated Mr. Martin had taunted you. Please explain how he did that.
A: Initially as he drove past me bobbing his head up and down looking straight in my eyes and when I asked for his ID and he stated " what the fuck for"

Q: When the telephone was taken from Mrs. Martin, she demanded it back. Why did you tell her she could have it back if she deleted the pictures in it?
A: They had said there were some possible naked pictures of her on the camera. We told her if she deleted them she had to delete all the pictures. The pictures do not do anything for him

Q: Did you make a comment or did anyone else make a comment something to the effect "you are just another notch on my belt"?
A: No, what I told him was that he was just another stat. What I meant he was nothing special. He was another person who broke the law and would be going to jail for it.

Q: Did you make a comment or did anyone else make a comment something to the effect "you are glad Jonnie Cochran is dead"?
A: I said that, my meaning was. They were talking about getting Jack Swirling. I said it was a good thing Jonnie Cochran is dead or they would get him

Q: Did you see a black female holding a small dog?
A: I saw a small dog, I don't remember if anyone was holding it or not

Q: Did you or anyone else threaten to put a black female in jail that was in the immediate area?
A: Yes, I didn't Dep. Clark did.

Q: Did he push her?
A: No

Q: Are you sure?
A: I know for fact he did not

This statement was made in the presence of Inspector Robert White of the Richland County Sheriff's Department Internal Affairs.

All of the above is the truth, the whole truth and nothing but the truth.

SWORN TO AND SUBSCRIBED BEFORE ME
THIS ___2__ DAY OF __Apr__ , 20 05

NOTARY PUBLIC FOR SOUTH CAROLINA
9/2/11

Signed: _____

Witness: _____

Witness: _____

